OPINION OF THE COURT
Simons, J.
Defendant has been convicted after a jury trial of murder, second degree, for the stabbing death of a prostitute named O’Hare McMillon. He contends that his conviction must be reversed because it rests on evidence of privileged statements he made in his lawyer’s office and statements improperly solicited by a police guard while he was in custody, and because the court’s charge to the jury violated the rule in Sandstrom v Montana (442 US 510). The *371 Appellate Division affirmed the judgment by a divided court. The majority agreed with the trial court that defendant’s statements made in the lawyer’s office were not privileged and that his statements to the jail guard were spontaneous. It held that the court’s charge though erroneous was harmless (People v Mitchell, 86 AD2d 976). The dissenter at the Appellate Division voted to reverse on the Sandstrom issue and to conduct a hearing on the question of privilege. There should be an affirmance.
Defendant was a resident of Waterloo, New York, and, at the time these events occurred, he was under indictment for causing the stabbing death of his girlfriend, Audrey Miller, in February, 1976. He was represented on that charge by Rochester attorney Felix Lapine. In January, 1977 defendant went to Rochester to take care of some personal matters and registered at the Cadillac Hotel. On the evening of January 5 while sitting at the hotel bar, he met O’Hare McMillon. They had two or three highballs and then were seen to leave the bar about 11:00 p.m. and take the elevator to the floor on which Mitchell’s room was located. No one saw either of them leave defendant’s room that night or the next. morning, but in the afternoon of January 6, on a tip from attorney Lapine, the police went to defendant’s hotel room and found the partially clad dead body of O’Hare McMillon on the bed. She had been stabbed 11-12 times in the face, chest and back. At least four of the wounds were sufficient to cause her death by exsanguination.
After leaving the hotel room that morning, defendant went to attorney Lapine’s office. Lapine was not in but defendant met and spoke to a legal secretary, Molly Altman, in the reception area. She testified that he seemed nervous and as if he was looking for someone. Apparently he could not find whomever it was he was looking for so he left only to return a minute later and start telling her about what happened the night before. She testified that he said: “he wanted to go out and have a last fling * * * he had been out drinking and met a girl and then he woke up in the morning and she was dead. He had stayed there all night and then he walked out again”.
*372 While he was talking to Ms. Altman, Judith Peacock, another legal secretary, entered the reception area. She testified that defendant was kind of rambling on but he said that: “he had laid next to someone all night and they didn’t move, and he [was] in a bar and * * * in a hotel * * * this person who he had laid next to was black and he was worried because when the black people found out about it, they protect their own and he would be in danger”. She also testified that he muttered something about a knife.
Ms. Pope-Johnson entered the room. She asked defendant what was wrong and he told her: “that there was a dead body and he felt that he had done it and that the person was dead, that she was dead because of being stabbed.”
Shortly thereafter, Lapine entered the office and talked privately with defendant. After defendant left Lapine called the police and had them check defendant’s hotel room. The body was discovered, defendant’s identification learned from the hotel registration and defendant found and arrested at a bar near the courthouse.
At the police station while defendant was waiting to be processed, he was placed in a room and guarded by a Sergeant Page. He had been given his Miranda rights, and attorney Lapine had visited him privately and advised the police not to interrogate his client. It was Page’s testimony, credited by the trial court and the Appellate Division, that defendant, while so guarded, spontaneously asked Page if the police had found the knife and then stated: “I must have killed her like I did Audrey and I don’t remember that either.” “I picked her up in a bar last night.” At trial the statements were redacted to eliminate the reference to Audrey and received by the court as spontaneous statements. That finding of fact was supported by the evidence (see People v Lynes, 49 NY2d 286, 294; cf. People v Lanahan, 55 NY2d 711). Molly Altman, Judy Peacock and Robin Pope-Johnson also testified at trial about defendant’s inculpatory statements made in the law office after the court determined that the statements were not privileged.
*373 I
The attorney-client privilege, developed at common law, is now contained in our statute (CPLR 4503, subd [a]). Its purpose is to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidence will not later be revealed to the public to his detriment or his embarrassment. The court recently formulated the elements of the privilege as follows: “First, it is beyond dispute that no attorney-client privilege arises unless an attorney-client relationship has been established. Such a relationship arises only when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services. (CPLR 4503, subd [a]; see, e.g., People v Belge, 59 AD2d 307, 309; United States v United Shoe Mach. Corp., 89 F Supp 357, 358-359, supra; 8 Wigmore, § 2292.) Second, not all communications to an attorney are privileged. In order to make a valid claim of privilege, it must be shown that the information sought to be protected from disclosure was a ‘confidential communication’ made to the attorney for the purpose of obtaining legal advice or services. (Matter of Jacqueline F., 47 NY2d 215, 219, supra; People ex rel. Vogelstein v Warden of County Jail of County of N. Y., 150 Misc 714, 717-718; 8 Wigmore, § 2292.) Third, the burden of proving each element of the privilege rests upon the party asserting it. (Matter of Gavin, 39 AD2d 626, 628; Matter of Grand Jury Empanelled Feb. 14,1978, 603 F2d 469, 474.) Finally, even where the technical requirements of the privilege are satisfied, it may, nonetheless, yield in a proper case, where strong public policy requires disclosure. (Matter of Jacqueline F., 47 NY2d 215, supra; People ex rel. Vogelstein v Warden of County Jail of County of N. Y., 150 Misc 714, supra.)” (Matter of Priest v Hennessy, 51 NY2d 62, 68-69.)
Defendant sought to foreclose the testimony of Pope-Johnson, Altman and Peacock, contending that because of Lapine’s prior retainer by defendant for the homicide of his girlfriend there was an ongoing attorney-client relationship which made any statements of defendant uttered in Lapine’s office or waiting room privileged. The court excused the jury and conducted a voir dire of Mr. Lapine and *374 Robin Pope-Johnson, Lapine’s paralegal, correctly ruling that defendant bore the burden of establishing that his statements were privileged.
Attorney Lapine testified that he was first retained by defendant in February, 1976 and that he was retained by defendant on this indictment the afternoon of January 6, 1977; that he was not present when Mitchell entered his office at noon on January 6 and that he did not know who was. Lapine did not talk with defendant about this charge until after defendant’s conversations with Ms. Pope-Johnson, Ms. Mitchell and Ms. Peacock. He testified further that he had one employee working for him at the time, Ms. Pope-Johnson. On cross-examination he testified that he occupied the offices with attorneys named Napier and Bushorr and that he and Napier were partners “[i]n a vague sort of way.” The relationship between Lapine and Napier was never clarified but Lapine did testify that Bushorr was not associated with either Napier or himself but was given free office space near Ms. Pope-Johnson’s desk in exchange for the work he did for them.
After Lapine testified, defense counsel moved to exclude the testimony of Ms. Pope-Johnson on the grounds of privilege. The court refused to accept defense counsel’s contention that there was continuous representation originating with Lapine’s retainer to represent defendant on the unrelated indictment for the February, 1976 homicide and held also that the employee could not establish an attorney-client- relationship for her employer in his absence. The court ruled that Ms. Pope-Johnson could testify to any conversation with defendant before Lapine returned to the office.
Defense counsel then conducted a voir dire of Ms. Pope-Johnson. She testified that she knew of the representation on the 1976 homicide but that she had, at most, said hello to defendant prior to January 6 and that she did not speak to him on the telephone about this case that day before he came to the office. Defense counsel then considered checking Lapine’s telephone logs or offering defendant’s testimony that there .had been a morning telephone call to Ms. Pope-Johnson to establish the retainer. The court did not foreclose the evidence but indicated that in its judgment it *375 would not be sufficient to establish that an attorney-client relationship hád been created before defendant came to the office. Counsel offered no further evidence. The District Attorney then stated that he had discovered that defendant had also made statements to Molly Altman and Judy Peacock. The court asked the attorney if they were employees of the office and the District Attorney answered, “[t]wo secretaries”. The court stated that its ruling would be the same as that made for the testimony of Ms. Pope-Johnson. Defense counsel did not confirm or correct the court’s statements about the other women’s relationship to the office. The District Attorney then stated that defendant’s statements were also made in the presence of a client who was in the office, but evidence of the presence of such a person was never offered.
On this state of the record, we conclude that defendant has not met his burden of establishing that when he spoke to these unknown women in a common reception area, his statements were intended to be confidential and made to an employee of his attorney for the purpose of obtaining legal advice. The only evidence identifying the women came from Lapine who responded to a question whether he had “any female employees” by saying “Yes, Robin Pope-Johnson”. She, it turns out, was the last woman in the office to hear defendant’s inculpatory statements and even if statements made to her at the time could have been privileged, the privilege was lost because of the prior publication to nonemployees and the utterance of the statements to Pope-Johnson in front of the nonemployees (see People v Buchanan, 145 NY 1, 26; People v Belge, 59 AD2d 307, 309). Taking this view we need not consider whether the statements could be privileged because of an ongoing retainer between defendant and Lapine or if they could be privileged if made to the attorney’s employee before a formal retainer was agreed upon.
II
Over defendant’s objection, the court charged the jury that a “person is presumed to intend the natural and probable consequences of his act and, accordingly, if the consequences are natural and probable, he will not be heard to say that he did not intend them.” We agree with *376 defendant that the charge was erroneous (see Sandstrom v Montana, 442 US 510, supra; People v Smalls, 55 NY2d 407; People v Getch, 50 NY2d 456; People v Thomas, 50 NY2d 467). We find the error insufficient to require reversal of defendant’s conviction, moreover, because intent was not a contested issue in this trial (see Connecticut v Johnson, 460 US_, 103 S Ct 969; People v Smalls, supra, p 417; McGuinn v Crist, 657 F2d 1107, cert den 445 US 990; cf. People v Marr, 50 NY2d 456; People v Egan, 72 AD2d 239). The principal issue was the identity of the perpetrator. Counsel’s cross-examination of the People’s witness was devoted largely to that subject and defendant rested without presenting any evidence. In summation counsel argued almost exclusively that someone else could have stabbed the victim after defendant left his hotel room, and he reviewed the evidence in a light attempting to establish that theory. As evidence of intent, the People proved that the victim’s body was found in defendant’s hotel bed, that she had several broken teeth, one identified positively as a recent break because of the fresh blood, and that she had been stabbed 11 times in the face and chest and once in the back. The wounds were inflicted at the same time, four of the stab wounds to the chest were fatal and the victim expired within minutes after being stabbed. There was no evidence during the trial that defendant was intoxicated or unable to form the necessary intent. Indeed, it was the medical examiner’s testimony that death occurred after 4:45 a.m. on January 6 during a time period when the evidence established that defendant had been in the hotel room and long after the couple had left the bar. Thus the record contains overwhelming evidence that defendant was the perpetrator of the crime and that whoever stabbed O’Hare McMillon did so with the conscious objective of causing her death.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler, Fuchsberg and Meyer concur.
Order affirmed.