657 A.2d 997

**COMMONWEALTH of Pennsylvania**

v.

**Joseph Matthew MROZEK, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 15, 1994.

Filed April 26, 1995.

Patrick J. Thomassey, Monroeville, for appellant.

Richard E. Bower, Asst. Dist. Atty., Uniontown, for Com., appellee.

Before DEL SOLE, FORD, ELLIOTT and BROSKY, JJ.

BROSKY, Judge.

This is an appeal from a judgment of sentence imposed upon appellant after he was convicted of first degree murder in a jury trial. Appellant raises several issues for our review, including whether the court erred in allowing testimony of his attorney's secretary regarding an inculpatory statement he made to her when he called to enlist the aid of his attorney regarding the impending homicide charges upon which he was eventually convicted. We vacate and remand.

The charges in question stem from the killing of Danette Ritz in the early morning hours of July 3, 1990. Responding to a phone call from appellant's brother, emergency personnel found Ms. Ritz dead on Royal Road shortly after 3:10 A.M. on July 3, 1990. An autopsy performed later revealed that the victim had sustained two gunshot wounds to her head. There was also an entry and exit wound through her right wrist.

According to witnesses, appellant and Ms. Ritz had been in a sometimes stormy relationship for a period of time. On the night of the murder, appellant and Ms. Ritz had been seen together at a local tavern past midnight. They were also seen together at appellant's nephew's home between 1:00 and 1:30 A.M. Alex Lukasevic, who lived on Royal Road, testified that he was awake at 2:30 A.M. July 3rd and heard two gunshots, seconds apart, down in the hollow. Appellant's brother Brian testified that appellant came to his room in the early morning hours and said that he thought Danette had been shot down on the "lower road." Brian went to the location appellant had indicated and found Danette lying there. He checked for a pulse but could not find one. He then returned home and called for an ambulance. After appellant told Brian that

Danette had been shot, appellant was not seen by his family for a few days.

On the day following the murder of Danette Ritz, appellant appeared at the District Attorney's office for questioning in connection with the murder of Danette Ritz accompanied with attorney Sam Davis. It would appear that earlier in the day appellant phoned Attorney Davis, with whom he had a professional relationship from earlier representations.[1] The phone was answered by Davis' secretary, Melissa Shupe. According to Ms. Shupe, appellant asked to speak to Attorney Davis. Ms. Shupe called Attorney Davis in his office and asked if he would speak to appellant. Mr. Davis responded that he was with clients and was not then available to speak with appellant. When Ms. Shupe told appellant that Mr. Davis was unavailable to speak with him, appellant responded that it was very important that he speak with Mr. Davis and asked her if she could try again to get Mr. Davis to speak with him. Ms. Shupe again spoke with Attorney Davis and relayed the message of urgency but Mr. Davis still declined to speak with him. When Ms. Shupe told appellant this, appellant responded, "Honey, I don't think you understand. I've just committed a homicide. I have to talk with Sam." When Ms. Shupe relayed this message Attorney Davis answered the phone and spoke with appellant.

On July 22, 1990, a vehicle registered to appellant's father and known to be driven by appellant was found at a truck stop in North Lima, Ohio. The car was confiscated and found to contain blood splatterings. Samples were taken and DNA testing was conducted. The tests revealed a match with the blood of the victim. Appellant was arrested formally on homicide charges in December of 1990. Before the case came to trial the District Attorney was informed that appellant had made an inculpatory statement to Ms. Shupe. Ms. Shupe was subpoenaed to testify after which appellant filed a motion to

---

1. Ms. Shupe did not recall with certainty when the phone call took place. Of course, the circumstances of the case and the nature of the communication strongly suggest that it occurred on the morning of July 3, 1990, after Ms. Ritz had been shot and before appellant appeared at the D.A.'s office with Attorney Davis.

428

suppress the evidence on the basis of the attorney-client privilege. The court ruled against appellant and, ultimately, Ms. Shupe testified as outlined above. Appellant was convicted of first degree murder. He then filed a motion in arrest of judgment which was denied and this appeal followed.

The question we must decide is whether an inculpatory statement made to an attorney's secretary which is made with the purpose of seeking legal assistance and representation in a criminal matter is a privileged communication. We conclude that it is. The generally recited requirements for assertion of the attorney-client privilege are:

1) The asserted holder of the privilege is or sought to become a client.

2) The person to whom the communication was made is a member of the bar of a court, or his subordinate.

3) The communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort.

4) The privilege has been claimed and is not waived by the client.

*United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.C.Mass.1950).

In the present case, all of these requirements have been met with respect to the communication in question. Appellant called his attorney, (with whom he already had a professional relationship), for the purpose of retaining him to defend against murder charges which he anticipated would be filed against him; the communication was made to the attorney's secretary, a subordinate; the communication was not in the presence of strangers; the communication was made expressly to get the attorney to speak to him regarding the representation and the privilege was both claimed and not waived.

In concluding that the communication was not privileged the court indicates that appellant, at the time of the communication, had not yet spoken to attorney Davis nor consulted him

regarding a defense, thus, the court concluded, there was not a confidential communication. However, this conclusion overlooks the full scope of the first requirement which indicates that the holder of the privilege is *or sought* to become a client. Not only had attorney Davis represented appellant in the past, his phone call in which the communication was made was clearly for the purpose of retaining Attorney Davis to represent him. Thus, not even considering the fact that appellant already had a pre-existing attorney-client relationship with Davis, the fact that appellant called to seek legal assistance would satisfy the first requirement.

Although we have found no Pennsylvania cases where communications prior to the establishment of a formal attorney-client relationship were at issue, the authority exists to support the proposition that an initial communication with an attorney can be privileged despite a lack of a formal attorney-client relationship. In *Taylor v. Sheldon,* 172 Ohio St. 118, 173 N.E.2d 892 (1961), the Ohio Supreme Court stated "[i]n order for a person to have complete freedom in seeking the services of an attorney, it necessarily follows that disclosures made by such a person to an attorney with the view of enlisting the attorney's services in his behalf fall within the rule making communications between an attorney and his client privileged.... In other words, communications made by a person to an attorney with the view of retaining the attorney to act on his behalf constitute privileged communications. It might well be said that a tentative attorney-client relationship exists during such period." 173 N.E.2d at 895. A similar statement was made by the Criminal Court of Appeals of Oklahoma in *Hurt v. Oklahoma,* 303 P.2d 476 (Okl.Cr.App. 1956). The court quoted an earlier decision stating "[a]n attorney is employed in his professional capacity when he is voluntarily listening to a client's preliminary statement. It is not necessary that any retainer should have been promised, paid, charged, or demanded, and it makes no difference even though the services are gratuitous." Id., 303 P.2d at 481. (Quoting from *Evans v. State,* 5 Okla.Crim. 643, 115 P. 809 (1911).)

■ The trial court also appears to conclude that Attorney Davis' secretary is not a subordinate for purposes of the privilege. Again, we disagree. The trial court quoted Wigmore in the following fashion:

The privilege protects communication to the attorney's clerks and his other agents (including stenographers) for rendering his services. The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents.

Citing 8 Wigmore *Evidence* § 2301. However, having made the above recitation, the court, almost inexplicably, finds Ms. Shupe not to be a subordinate. That Ms. Shupe was attorney Davis' subordinate is borne out not only by the fact that she works for him and takes orders from him,[2] but also from the fact that she acts as the main liaison between Davis and his clients. Indeed, in the present case, despite two unsuccessful attempts, appellant could not even speak directly with Attorney Davis until after appellant had disclosed the communication at issue to Ms. Shupe who then relayed the message directly to Attorney Davis. To suggest that Ms. Shupe was not a subordinate to whom the privilege would apply is to ignore the realities of not only that which took place here, but the realities and common experiences of legal practices everywhere.

Although a review of Pennsylvania law does not yield many cases where the privilege has been applied to communications to individuals other than an attorney, our conclusion that the communication made to Ms. Shupe would implicate the attorney-client privilege is supported by our previous decision in *Commonwealth v. Hutchinson*, 290 Pa.Super. 254, 434 A.2d 740 (1981).

In *Hutchinson* we affirmed a decision of the lower court that a disclosure made to an investigator from the public defender's office should be afforded the protection of the

**2.** Webster's New Collegiate Dictionary defines subordinate as one "placed in or occupying a lower class or rank ... submissive to or controlled by authority...."

attorney-client privilege. Citing Wigmore and other cases, we noted that the privilege applied not only to communications made to an attorney, but also to an attorney's agents. A similar result was reached by the Supreme Court of Illinois in *People v. Knippenberg,* 66 Ill.2d 276, 6 Ill.Dec. 46, 362 N.E.2d 681 (1977). In reversing a decision to allow impeachment with statements made by a defendant to an investigator the Court quoted the same section of *Wigmore* as did the trial court here, § 2301. The court further added: "As the use of law clerks, secretaries and stenographers is common and necessary for an attorney as a practical matter, realities of practice often require an attorney's use of investigators." 362 N.E.2d at 684. Thus, the Illinois Supreme Court did not hesitate to afford the attorney-client privilege to communications made to an attorney's employee.

We have found only a few cases where the attorney-client privilege involved disclosures to or in the presence of a secretary. A communication to an attorney in the presence of a secretary has been found protected in *State v. Krich,* 123 N.J.L. 519, 9 A.2d 803 (1939) and *Taylor v. Taylor,* 179 Ga. 691, 177 S.E. 582 (1934), while disclosures to three secretaries outside the presence of an attorney was found not privileged in *People v. Mitchell,* 58 N.Y.2d 368, 461 N.Y.S.2d 267, 448 N.E.2d 121 (1983). Although, at first blush the holding in *Mitchell* may appear inconsistent with our decision here, the reasoning relied upon in that case is not applicable here. Thus, we find it distinguishable.

In *People v. Mitchell,* John Mitchell, who was awaiting trial for the stabbing death of his girlfriend concluded, despite having no specific recollection of the fact, that he must have committed another murder when he awoke next to a women who had been stabbed several times. Distraught he went to his attorney's office only to find the attorney, Felix Lapine, out at the time. He left but returned shortly and began telling the woman in the reception area what had happened. While he was rambling on about the incident another woman entered the area but he continued talking about it. Shortly thereafter, Lapine's secretary entered the room and seeing Mitchell there asked him what was wrong. Mitchell respond-

ed by telling her that he had awoke next to a dead body and he felt that he had done it. The testimony of the three women was allowed over objection. Upon appeal the decision was upheld. However, noteworthy for our purposes, the decision that the communications were not privileged did not hinge upon the fact that the communications were made to secretaries as opposed to an attorney. Rather, the court concluded that Mitchell, considering the context in which the statements were made, had failed to carry his burden that the statements "were intended to be confidential and made to an employee of his attorney for the purpose of obtaining legal advice." Id., 461 N.Y.S.2d at 271, 448 N.E.2d at 124.

Since the attorney-client privilege can attach to communications made to an attorney's employees and agents, and can also pertain to preliminary communications with regard to the retaining of his services, we must conclude that the inculpatory statement made by appellant in the present case is privileged. As such, it was error to allow the testimony of Ms. Shupe and, in consideration of the tremendously prejudicial nature of the statement, a new trial must be granted.

Judgment of sentence vacated. New trial granted. Jurisdiction relinquished.