J-A08013-22

2022 PA Super 87

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                        : PENNSYLVANIA
                                        :
        v.                              :
                                        :
                                        :
                                        :
                                        :
PAUL MICHAEL LEHMAN                     :
                                        :
        Appellant                      : No. 776 WDA 2021

Appeal from the Judgment of Sentence Entered June 1, 2021
In the Court of Common Pleas of Cambria County Criminal Division at
No(s): CP-11-CR-0000120-2019

BEFORE: BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

OPINION BY BENDER, P.J.E.: **FILED: MAY 11, 2022**

Appellant, Paul Michael Lehman, appeals from the judgment of sentence of life imprisonment without the possibility of parole, imposed following his conviction for first-degree murder and related offenses. Herein, Appellant challenges three of the trial court's evidentiary rulings. After careful review, we affirm.

Neither the trial court nor Appellant provided a summary of the facts adduced at Appellant's trial. However, the Commonwealth provided the following factual summary in its brief, to which Appellant has not taken any exception:

> On November 22, 2018, Johnstown Police Detective Sergeant Cory Adams ("Detective Adams") was called to a duplex on 827 Steel Street, in a portion of Johnstown known as Old Conemaugh Borough, for a reported homicide. [N.T.], 4/20/21, [at] 32-33. Detective Adams, along with other members of the Johnstown Police Department, entered the residence through the back door because the front door was secured with a deadbolt. *Id.* [at] 34-

35. As he entered the residence, Detective Adams observed water running down the stairs to the basement and blood smears on the walls. *Id.* [at] 39[]. Laying on the floor immediately in front of the door that leads from the basement to the living room, was the body of the deceased victim, nineteen-year-old, [Deontaye] Hurling ("Hurling"). *Id.* [at] 40[]. Hurling was discovered with a fish tank that appeared to be smashed over his head. *Id.* Later, an autopsy revealed that Hurling's cause of death was exsanguination and bilateral pneumothorax caused by multiple sharp-force injuries (stab wounds). [N.T.], 4/21/21, [at] 8. Dr. Curtis Goldblatt, a board-certified pathologist, testified that Hurling had suffered between forty-five (45) and forty-six (46) stab wounds, including fatal wounds to his neck, torso[,] and hand. *Id.* [at] 15-64. The description of the wounds evidenced a violent and brutal struggle between Hurling and his assailant. *Id.* The day following the discovery of Hurling's body, Johnstown Police Detective Mark Britton ("Detective Britton") testified that [Appellant] confessed that he was responsible for Hurling's death and that he did so because Hurling reached for a gun. N.T.[], 4/20/21, [at] 88-90. [Appellant] indicated to Detective Britton that he was not in the Johnstown area but would come to the Public Safety Building ("PSB") in the city to speak with police. *Id.* [at] 89[]. [Appellant] never came to the PSB at the appointed time and Detective Britton received a call that [Appellant] was back in the Johnstown area. *Id.* [at] 90-91. Detective Britton apprehended [Appellant] in the Woodvale section of Johnstown later that evening. *Id.* [at] 94[]. [Appellant] had painted his white vehicle with teal spray paint in an effort to avoid detection. *Id.* [at] 95.

Detective Britton later learned that evidence may have been removed from 827 Steel Street after Hurling's murder but prior to the police arriving. *Id.* [at] 116-[]17. Cell phones that were removed from the scene by Jasmine Primus were later recovered, however, no firearm was ever recovered. *Id.* [at] 118.

[Appellant] took the stand as part of the defense's case. N.T.[], 4/22/21, [at] 4-63. [Appellant] testified that he went to Hurling's house to find him in a "crazy rage" over money [Appellant] owed to Hurling. *Id.* [at] 33. He indicated that Hurling "reached" and [Appellant] proceeded to "jump in the air." *Id.* [at] 34. [Appellant] stabbed Hurling and Hurling then dropped the gun. *Id.* Hurling then tackled [Appellant] and then Hurling drove his own head through a fish tank. *Id.* [Appellant] described his

actions as "poking" Hurling with a knife at this point. *Id.* [at] 34-35.

During the Commonwealth's cross-examination, [Appellant] denied stabbing Hurling forty-five (45) times and tried to attribute some of the victim's injuries to the glass from the fish tank. *Id.* [at] 48, 60. He was also confronted with text messages from the victim[,] wherein it was clear the victim had no "beef" with [Appellant,] and told him to keep his money. *Id.* [at] 53. Additionally, the Commonwealth was able to establish, despite his denials from the stand, that [Appellant] referred to a portion of … his personality as "the beast[."] *Id.* [at] 58-59. [Appellant] also acknowledged that he could get upset when people brought his girl into things, or even mentioned her name. *Id.* [at] 56-58. Hurling brought up [Appellant]'s then girlfriend, Nicolette, on the evening that [Appellant] killed Hurling. *Id.* [at] 57.

Commonwealth's Brief at 3-5.

The Commonwealth charged Appellant with first-degree murder and related offenses. Prior to trial, Appellant filed a motion to suppress a recorded telephone conversation, claiming that it had been obtained in violation of the Wiretap Act.[1] He also filed a motion *in limine* seeking to admit music videos in which the victim performed rap songs with violent lyrical and visual content. Both motions were denied by the trial court in an opinion and order dated September 29, 2020.[2] Following a three-day trial in April of 2021, a jury convicted Appellant of first-degree murder, two counts of aggravated assault, and tampering with evidence.[3] On June 1, 2021, the trial court sentenced

---

[1] *See* Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5701 *et seq.*

[2] *See* Pretrial Opinion ("PTO"), 9/29/20, at 3-5 (addressing the wiretap issue); *id.* at 5-8 (addressing the rap video issue); *id.* at 10-11 (order).

[3] Respectively, 18 Pa.C.S. §§ 2501(a), 2702(a)(1), 2702(a)(4), and 4910(1).

Appellant to a mandatory term of life imprisonment without the possibility of parole for first-degree murder, and to a concurrent term of 2-24 months' incarceration for tampering with evidence. The remaining aggravated assault counts merged for sentencing purposes with Appellant's first-degree murder conviction.

Appellant did not file a post-sentence motion. He filed a timely notice of appeal on June 24, 2021, and a timely, court-ordered statement pursuant to Pa.R.A.P. 1925(b).[4] The trial court issued its Rule 1925(a) opinion on August 18, 2021. Trial Court Opinion ("TCO"), 8/18/21, at 1-13. Therein, the court relied, in part, on its prior opinions dismissing Appellant's pretrial motions. *Id.* at 12-13 (addressing Appellant's motion *in limine*); *id.* At 13 (addressing Appellant's suppression motion).

Appellant now presents the following questions for our review:

   I.   Whether the trial court erred in denying … Appellant's right to present as evidence certain songs the decedent had authored and music videos which he created and starred in on the video streaming service YouTube?

   II.  Whether the trial court erred in permitting the Commonwealth to introduce a certain text message that Appellant sent to an attorney shortly after the incident which led to the charges being filed?

   III. Whether the trial court erred in permitting the Commonwealth to utilize previous[,] perjur[i]ous statements [by] Appellant in cross examination of Appellant in violation of the Pennsylvania Rules of Evidence?

---

[4] Pursuant to a request by the trial court for further clarification of an issue, Appellant also filed a supplemental Rule 1925(b) statement.

Appellant's Brief at 4.

All of Appellant's claims concern the admissibility of evidence.

[T]he admissibility of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon abuse of that discretion. An abuse of discretion will not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. Moreover, an erroneous ruling by a trial court on an evidentiary issue does not necessitate relief where the error was harmless beyond a reasonable doubt.

*Commonwealth v. Travaglia*, 28 A.3d 868, 873–74 (Pa. 2011) (cleaned up).

## I.

Appellant first claims that the trial court erred by denying his motion *in limine* seeking to present evidence of the victim's rap music videos to the jury. In these videos, Hurling, "can be heard rapping about his capacity, willingness[,] and desire to commit acts of violence and his access to and ownership of firearms." Appellant's Brief at 11. Moreover, in "three of the four videos," the victim "brandishes firearms and points them repeatedly at the camera." *Id.* Appellant contends that these videos were admissible to "offer specific instances" of the victim's conduct, in order "to show his turbulent and dangerous character[.]" *Id.* at 14. He further argues the evidence was relevant because the videos "tend to make [Appellant's] claim of self-defense more probable than it would be without the evidence." *Id.* The trial court rejected this claim, reasoning that the videos were not "properly

authenticated[,] … [were] likely to be taken out of context by the jury, and [were] portrayed as acts of violence, which they might not necessarily be." PTO at 8.

> Only relevant evidence is admissible at trial. Pa.R.E. 402. Evidence is relevant if it tends to make a material fact more or less probable than it would be without the evidence. *Id.*, [Pa.R.E.] 401. Even if relevant, however, evidence may be excluded "if its probative value is outweighed by ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.*, [Pa.R.E.] 403.

*Commonwealth v. Christine*, 125 A.3d 394, 398 (Pa. 2015).

In the context of a self-defense claim, evidence of the victim's propensity for violence may be relevant "(1) to corroborate [the defendant's] alleged knowledge of the victim's quarrelsome and violent character to show that the defendant reasonably believed that his life was in danger; [and/]or (2) to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor." *Commonwealth v. Amos*, 284 A.2d 748, 751 (Pa. 1971) (holding, more specifically, that the victim's prior criminal record of convictions would be admissible for either of these purposes if the accused was aware of that record). However, a victim's criminal record is not admissible without qualification in self-defense cases. If the accused has no knowledge of the victim's prior criminal record, he cannot seek admission of the record for purpose of showing the reasonableness of his fear, but when evidence of "a previous violent act has been reduced to a conviction, the defendant may use that conviction, regardless of whether he had previous knowledge of it, to prove the violent propensities of the victim and to establish

that the victim was the aggressor." ***Commonwealth v. Stewart***, 647 A.2d 597, 599 n.1 (Pa. Super. 1994). Nevertheless, even when the sole purpose for admitting a prior criminal record is to show that the victim was the aggressor, the accused must still demonstrate that the prior criminal acts sought to be admitted "are similar in nature and not too distant in time" from the underlying incident. ***Commonwealth v. Christine***, 78 A.3d 1, 5 (Pa. Super. 2013), *affirmed*, 125 A.3d 394 (Pa. 2015).

While a record of convictions may be admissible as evidence to show the accused's fear was reasonable, and/or to show the alleged victim was the aggressor, an arrest record is only admissible for the former purpose. ***See Commonwealth v. Darby***, 373 A.2d 1073, 1074–75 (Pa. 1977). This is because a victim's arrest record is highly relevant to demonstrate the reasonableness of the accused's fear in self-defense cases, while arrest records are far less relevant than conviction records for purposes of demonstrating the victim's actual propensity for violence. ***Id.*** Nevertheless, consistent with a prior conviction record, evidence of a prior arrest record is inadmissible for purposes of showing a reasonable fear if the accused was not aware of the prior arrests. ***See Commonwealth v. Ignatavich***, 482 A.2d 1044, 1047 (Pa. Super. 1984) (holding that the victim's "prior arrest for assault and the specific facts giving rise thereto were irrelevant and inadmissible" to show the accused's reasonable belief that his life was in danger because the accused lacked knowledge of those events at the time he stabbed and killed the victim).

Our Supreme Court has also determined that the scope of evidence admissible for these purposes is not limited to arrest and conviction records; eyewitness evidence describing the victim's prior violent acts and violent tendencies may also be admitted to demonstrate the reasonableness of the accused's fear, as well as to show the alleged victim's propensity for violence. *See Commonwealth v. Dillon*, 598 A.2d 963, 964-65 (Pa. 1991) (holding that the accused's son's testimony that the victim would become violent when drunk was admissible to establish both the accused's reasonable fear and that the victim was the aggressor, where other testimony indicated that he was intoxicated when the fatal stabbing occurred).

Here, Appellant sought admission of four videos wherein Hurling raps about committing acts of violence, often while pointing guns at the camera, or with a visible firearm tucked into his pants. Appellant describes these videos in detail in his brief. *See* Appellant's Brief at 11-14. He contends the videos "lead to the logical conclusion that Hurling, at the very least, was seeking to adopt an aggressive and dangerous persona." *Id.* at 15. Although that suggests Appellant sought to admit the video to show the reasonableness of his fear of Hurling, Appellant does not develop that argument further. Indeed, as the Commonwealth correctly points out, "no foundation [was] laid [to show] that [Appellant] had knowledge of the videos prior to stabbing Hurling." Commonwealth's Brief at 15. Based on our review of the record, we agree with the Commonwealth that Appellant did not proffer any evidence that he had knowledge of the four, at-issue rap videos before he killed Hurling.

- 8 -

Accordingly, we conclude that the videos were not admissible to show the reasonableness of Appellant's fear of Hurling at that time.[5]

The question remains whether the trial court erred in deeming the videos inadmissible to show that Hurling was the aggressor. The trial court determined that, although the videos were self-authenticating in the sense that it is not disputed that Hurling "is the main actor" depicted therein, there was "no testimony offered to authenticate whether Mr. Hurling is the main character in the rap videos, that Mr. Hurling wrote the lyrics to the rap songs, or when these videos were originally recorded." PTO at 7. That is, there was nothing tending to show that Hurling's rap songs were autobiographical. Moreover, the court found that Appellant failed to proffer evidence tending to demonstrate that the content of the rap videos was anything but fiction. The trial court found persuasive language in an unpublished decision by the Eastern District of Pennsylvania, where the district court noted that:

> Viewed in their broader artistic context, the rap music evidence does not have a high probative value. Rap lyrics are not necessarily autobiographical statements; rather, rap music is a well-recognized musical genre that often utilizes exaggeration, metaphor, and braggadocio for the purpose of artistic expression.

_____

[5] The trial court did not specifically address the admissibility of the videos for this purpose. Nevertheless, Appellant did not argue below, nor does he specifically contend now on appeal, that he was aware of the videos at the relevant time. Thus, the trial court's failure to address the videos' admissibility for that purpose does not hinder our review. Moreover, it "is well settled that where the result is correct, an appellate court may affirm a lower court's decision on any ground without regard to the ground relied upon by the lower court itself." **Commonwealth v. Singletary**, 803 A.2d 769, 772–73 (Pa. Super. 2002) (quoting **Boyer v. Walker**, 714 A.2d 458, 463 n.10 (Pa. Super. 1998)).

- 9 -

Because rap lyrics may falsely or inaccurately depict real-life events, they should not necessarily be understood as autobiographical statements.

*U.S. v. Bey*, CR 16-290, 2017 WL 1547006, at *6 (E.D. Pa. Apr. 28, 2017).

While it is not controlling authority, we would reach the same conclusion as the court in *Bey* regarding the probative value of rap lyrics in a general sense. Regardless of the genre, song lyrics are often fictional, or exaggerations of real events; that is, it is not reasonable to assume that song lyrics are strictly autobiographical as to past conduct or future aspirations, unless at least some evidence is proffered to suggest otherwise. Song lyrics are also often written in the first-person perspective, despite depicting fictional events and characters. We agree with the trial court that rap music, in particular, often makes extensive use of these literary techniques. Moreover, it is not uncommon for artists to perform lyrics written by others. Thus, the admission of rap lyrics as evidence of a propensity for violence by the performing artist must be viewed with suspicion because such evidence is likely to be of limited probative value. For the same reasons, the admission of rap lyrics for that purpose risks confusing or misleading the jury under Pa.R.E. 403.

Notably, Appellant has not cited any authority wherein rap lyrics, or similar evidence of an artistic nature, have been deemed admissible as tending to show that a victim was the aggressor in the context of a self-defense claim. Nevertheless, we recognize that there may be circumstances where such evidence might be admissible for that purpose. Although not directly on

- 10 -

point, the courts of this Commonwealth have permitted the admission of rap lyrics where the content of those lyrics sufficiently dovetailed with real-world events and persons, so as to dispel the risk that the lyrics were purely fictional. For instance, in **Commonwealth v. Knox**, 190 A.3d 1146 (Pa. 2018), our Supreme Court rejected a First-Amendment challenge to the admission of rap lyrics. In that case, Knox had been arrested for drug and firearm offenses by Pittsburgh Police. **Id.** at 1148. Subsequently, while those charges were still pending, Knox and an associate made a rap video that was uploaded to YouTube, where "the song's lyrics express[ed] hatred toward the Pittsburgh police … [and] contain[ed] descriptions of killing police informants and police officers." **Id.** at 1149. Additionally, the lyrics specifically identified the arresting officers in Knox's criminal case and referenced a prior incident where three police officers were murdered by another individual in an ambush. **Id.** Knox was charged with terroristic threats and witness intimidation, and at trial, it became clear that "the rap song was the sole basis on which the Commonwealth sought convictions…." **Id.** at 1151. Our Supreme Court rejected Knox's First-Amendment challenge, determining that his rap video was not protected by the First Amendment because the lyrics were "both threatening and highly personalized to the victims[,]" and because several "aspects of the song … detract[ed] from any claim that [the lyrics] were only meant to be understood as an artistic expression of frustration." **Id.** at 1159. That is, because the lyrics specifically threatened the officers who had just recently arrested Knox, explicitly referenced Knox's actual arrest, and

- 11 -

repeatedly implied that the threats should be taken literally, the Supreme Court rejected Knox's characterization of the rap video as a merely fictional, artistic expression. *Id.*

The rap lyrics in *Knox* were themselves the statements that constituted the offenses of terroristic threats and witness intimidation. By contrast, in *Commonwealth v. Talbert*, 129 A.3d 536 (Pa. Super. 2015), the Commonwealth sought to introduce rap lyrics "to corroborate Talbert's role as one of the shooters through the use of his own words in the rap song." *Id.* at 540. The *Talbert* Court determined the lyrics in that case were admissible because they had referenced specific details involved in the murder for which Talbert was charged, including mentions of the neighborhood of the shooting, the weapons used, the escape vehicle, and the nature of the wounds to the shooting victims. *Id.* at 540-41.

In the present case, we ascertain no abuse of discretion by the trial court in its refusal to admit Hurling's rap videos for the purpose of demonstrating whether Hurling was the initial aggressor. The videos are categorically different from the record of convictions that were at-issue in *Amos*. If any comparison is to be made, violent rap lyrics are even less reliable than an arrest record as evidence of prior acts of violence, and an arrest record is not admissible to demonstrate that a victim was the initial aggressor in the context of a self-defense claim. *See Darby*, *supra*. The at-issue videos are also not analogous to testimony about a victim's prior violent acts as was at issue in *Dillon*, and, unlike what occurred in *Talbert*, no

evidence was proffered to demonstrate that the rap videos were anything but fictional works of art. Accordingly, we conclude that Appellant's first claim lacks merit.

## II.

Next, Appellant asserts that the trial court erred when it admitted a text message that Appellant sent to Attorney Donny Knepper following the killing of Hurling.[6] The Commonwealth sought to admit three such messages that Appellant sent to Attorney Knepper. *Id.* at 111-12. Appellant argued that the messages were inadmissible because they ostensibly were communications subject to attorney-client privilege. The trial court found that that "there was no evidence or testimony presented that Appellant contacted [Attorney] Knepper for the purposes of obtaining professional legal services from [Attorney] Knepper. There was also no evidence or testimony presented that Appellant was [Attorney] Knepper's client." TCO at 4-5. On that basis, the court determined that the first message sent by Appellant to Attorney Knepper was admissible. *Id.* at 3 (citing N.T., 4/21/21, at 111-13). Nevertheless, the court did not permit the Commonwealth to introduce Appellant's subsequent messages to Attorney Knepper. *Id.*

It is well-established that

---

[6] The at-issue message read, *verbatim*, as follows: "This nigga has threatened me numerous times with pistols in his hand. He said he was gonna kill me and my girl over 220 dollars then he reached for the back of his pants like he was going to pull out on me and I stabbed him to death." N.T., 4/21/21, at 113-14.

Pennsylvania law protects the attorney-client privilege and recognizes it as "the most revered of the common law privileges." [**Commonwealth v.**] **Chmiel**, 738 A.2d [406,] 414 [(1999)].[9] Because the privilege seeks to foster confidence between attorney and client in order to promote a trusting and open dialogue, permitting an attorney to reveal to others what the client has disclosed would destroy and prevent the benefits of representation. **Id.** at 423. In the criminal arena in particular, "the difficulty of obtaining full disclosure from the accused is well known, and would become an absolute impossibility if the defendant knew the lawyer could be compelled to report what he had been told." **Id.** (quoting 1 McCormick on Evidence § 87 (4th ed. 1992)).

> [9] The attorney-client privilege, as it pertains to criminal matters, is codified at Section 5916 of the Judicial Code, 42 Pa.C.S. § 5916, as follows:
>
> > In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.
>
> 42 Pa.C.S. § 5916. The statutory codification of the attorney-client privilege suggests the General Assembly's acknowledgment of the significance of this protected interest. **See Chmiel**, 738 A.2d at 423; **see also Gillard v. AIG Ins. Co.**, … 15 A.3d 44, 59 ([Pa.] 2011) (holding that "the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice").

**Commonwealth v. Flor**, 136 A.3d 150, 158 (Pa. 2016).

Not every communication with an attorney is protected by attorney-client privilege. The attorney-client privilege only applies when the following requirements are met:

1) The asserted holder of the privilege is or sought to become a client.

- 14 -

2) The person to whom the communication was made is a member of the bar of a court, or his subordinate.

3) The communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort.

4) The privilege has been claimed and is not waived by the client.

*Commonwealth v. Mrozek*, 657 A.2d 997, 998 (Pa. Super. 1995) (quoting *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358-59 (D.C. Mass. 1950)) (hereinafter "Attorney-Client Privilege Test").

Instantly, Appellant seemingly argues[7] that he successfully invoked the privilege solely based on the fact that he had contacted Attorney Knepper in the wake of the stabbing. Appellant's Brief at 21. Appellant contends that *Mrozek* supports his claim in this regard, and so we examine the facts of that case.

In *Mrozek*, the defendant was implicated in the fatal shooting of the victim.

> On the day following the murder…, [Mrozek] appeared at the District Attorney's office for questioning in connection with the murder of Danette Ritz accompanied with attorney Sam Davis. It would appear that earlier in the day[, Mrozek] phoned Attorney Davis, with whom he had a professional relationship from earlier representations. The phone was answered by Davis' secretary, Melissa Shupe. According to Ms. Shupe, [Mrozek] asked to speak to Attorney Davis. Ms. Shupe called Attorney Davis in his office and asked if he would speak to [Mrozek]. Mr. Davis responded

---

[7] Appellant's analysis of the merits of this claim is minimal. The bulk of the argument in his brief is instead devoted to his contention that the trial court's error in admitting the ostensibly privileged statement is not subject to the harmless-error standard.

that he was with clients and was not then available to speak with [Mrozek]. When Ms. Shupe told [Mrozek] that Mr. Davis was unavailable to speak with him, [Mrozek] responded that it was very important that he speak with Mr. Davis and asked her if she could try again to get Mr. Davis to speak with him. Ms. Shupe again spoke with Attorney Davis and relayed the message of urgency but Mr. Davis still declined to speak with him. When Ms. Shupe told [Mrozek] this, [Mrozek] responded, "Honey, I don't think you understand. I've just committed a homicide. I have to talk with Sam." When Ms. Shupe relayed this message[,] Attorney Davis answered the phone and spoke with [Mrozek].

*Commonwealth v. Mrozek*, 657 A.2d 997, 998 (Pa. Super. 1995) (footnote omitted).

In determining that Mrozek's statement to Shupe was protected by attorney-client privilege, the *Mrozek* Court reasoned as follows:

In the present case, all of these requirements [of the Attorney-Client Privilege Test] have been met with respect to the communication in question. [Mrozek] called his attorney, (with whom he already had a professional relationship), for the purpose of retaining him to defend against murder charges which he anticipated would be filed against him; the communication was made to the attorney's secretary, a subordinate; the communication was not in the presence of strangers; the communication was made expressly to get the attorney to speak to him regarding the representation and the privilege was both claimed and not waived.

*Id.* at 998–99.

The trial court in *Mrozek* had concluded that the communication was not privileged because Mrozek "had not yet spoken to [A]ttorney Davis nor consulted him regarding a defense[.]" *Id.* at 999. The *Mrozek* Court rejected that reasoning because it overlooked

the full scope of the first requirement which indicates that the holder of the privilege is or sought to become a client. Not only had [A]ttorney Davis represented [Mrozek] in the past, his phone

- 16 -

call in which the communication was made was clearly for the purpose of retaining Attorney Davis to represent him. Thus, not even considering the fact that [Mrozek] already had a pre-existing attorney-client relationship with Davis, the fact that [Mrozek] called to seek legal assistance would satisfy the first requirement.

*Id.*

The instant case is easily distinguishable from *Mrozek*. First, unlike what occurred in that case, Appellant did not demonstrate any prior attorney-client relationship with Attorney Knepper, and there is no evidence of record showing that Appellant retained him subsequently. Furthermore, Appellant did not proffer any evidence that he attempted to hire Attorney Knepper in this or any other matter. Thus, Appellant's claim fails under the first factor of the Attorney-Client Privilege Test.

Second, in *Mrozek*, the content of Mrozek's communication with his attorney's secretary clearly conveyed an intent to obtain legal advice or representation in the context of that case. Mrozek phoned his attorney at the attorney's office. When the secretary told Mrozek that his attorney was in the office but unavailable, Mrozek told her that he needed to speak with counsel because he had committed a homicide. Here, by contrast, Appellant's inculpatory statement in the text message was not accompanied by any language indicating that he had contacted Attorney Knepper for legal assistance. He did not contact Attorney Knepper at his office, and there is no evidence of record demonstrating that Appellant had texted a business phone, rather than Attorney Knepper's personal line. Thus, Appellant's claim also fails under the third factor of the Attorney-Client Privilege Test.

For these reasons, we ascertain no abuse of discretion in the trial court's admitting Appellant's first text message to Attorney Knepper. Appellant failed to satisfy the first and third elements of the Attorney-Client Privilege Test and, thus, the text message was not a privileged communication.[8]

Alternatively, even if the attorney-client privilege applied, we would nevertheless deem the trial court's admission of the first text message to be harmless error.

> Not all errors at trial … entitle an appellant to a new trial, and the harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial. Harmless error exists when, *inter alia*, the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence.

**Commonwealth v. Reese**, 31 A.3d 708, 719 (Pa. Super. 2011) (*en banc*) (cleaned up).

Here, the content of the text message was certainly prejudicial in the sense that it contained an admission by Appellant that he had killed Hurling.

---

[8] We note that the Commonwealth also argues that because Attorney Knepper was not licensed to practice law in Pennsylvania at the time Appellant sent the at-issue text message, Appellant ostensibly failed to satisfy the second factor of the Attorney-Client Privilege Test. However, it is undisputed that Attorney Knepper was licensed to practice law in another jurisdiction at the relevant time, and the Commonwealth fails to develop its argument as to why the attorney-client privilege would not apply merely because Attorney Knepper was an out-of-state attorney, or how that status undermines the principles underlying the privilege. Thus, we do not consider Attorney Knepper's non-licensure in Pennsylvania at the time Appellant sent the text message to be relevant to our analysis, because it is undisputed that he was a licensed attorney in a sister jurisdiction at the relevant time.

However, in this case, Appellant's killing of Hurling was not in dispute. Appellant confessed to this fact in his first interaction with police, which was a phone conversation he had with Detective Britton on the day after Hurling's body was discovered. *See* N.T., 4/20/21, at 88-89. Appellant also testified at trial that he had killed Hurling in self-defense. *See* N.T., 4/22/21, at 34-36. Thus, not only was the text message cumulative of Detective Britton's and Appellant's testimony regarding Appellant's killing of Hurling, but it also served to corroborate Appellant's self-defense claim, as it demonstrated that Appellant had consistently maintained that he acted in self-defense.

Notably, when questioned at trial as to how the content of the first text message prejudiced his client, Appellant's attorney vaguely responded that it hurt him "in some context[,]" but never elaborated as to what that context was. N.T., 4/21/21, at 112. Appellant's attorney argued only speculatively that the admission of the text message must be prejudicial because the Commonwealth "wouldn't present it if they didn't think it hurts." *Id.*

Appellant provides no further arguments in his brief as to how the admission of the text message prejudiced him. Perhaps conscious of this deficiency, Appellant instead argues that this issue "should not be addressed on a harmless-error standard." Appellant's Brief at 21. Appellant contends that the Commonwealth's presentation of evidence that is protected by the attorney-client privilege is a "structural error" that effectively "denied his right to counsel." *Id.* at 22. However, Appellant dutifully concedes that no existing caselaw directly supports this proposition. *Id.* Consequently, Appellant urges

this Court to extend our Supreme Court's recent holding in **Interest of J.M.G.**, 229 A.3d 571 (Pa. 2020), where the Court held that the harmless error doctrine is not applicable to violations of the psychotherapist-patient privilege in Act 21[9] cases.

In **J.M.G.**, the delinquent minor was under supervision due to a sexual offense against a sibling. **J.M.G.**, 229 A.3d at 574. The juvenile court ordered an "evaluation by the [Sexual Offender Assessment Board (SOAB)] in accordance with Section 6358 of the Juvenile Act." **Id.** The order directed the Juvenile Probation Department to redact, from the record sent to the SOAB, any admissions made by J.M.G. to a psychiatrist or psychologist during his mental-health treatment. **Id.** Over J.M.G.'s objection, some of the material provided to the SOAB included incriminating statements made by J.M.G. that were subject to the psychotherapist-patient privilege. **Id.** The SOAB ultimately recommended civil commitment based, *inter alia*, upon its review of the privileged admissions, and the juvenile court ordered J.M.G. to be committed based on that recommendation. **Id.** at 575.

On appeal, a panel of the Superior Court ruled that the juvenile court had erred in permitting the SOAB to review the privileged material, but nevertheless determined that it was harmless error, because the SOAB expert's "conclusions were not dependent on the improperly disclosed communications, but were supportable on other properly disclosed

---

[9] **See** 42 Pa.C.S. §§ 6401-6409.

information submitted to the SOAB." *Id.* at 576 (citing *In Interest of J.M.G.*, 192 A.3d 258 (Pa. Super. 2018) (unpublished memorandum)). Our Supreme Court ultimately reversed, holding that "the harmless error doctrine is not applicable to violations of Section 5944[10] psychotherapist-patient privilege in Act 21 proceedings." *Id.* at 583.

In reaching this conclusion, the *J.M.G.* Court distinguished the use of the harmless error doctrine in criminal cases from Act 21 proceedings, finding that, unlike in criminal cases, the "primary purpose of Act 21 is to provide continued mental health treatment to a class of juvenile offenders." *Id.* Our Supreme Court further opined that:

> The success of mental health treatment, including the willingness of the juvenile to cooperate with treatment, to be open and candid in communicating with the psychotherapist, and to trust in treatment recommendations, is dependent on the confidentiality protected by the privilege set forth in Section 5944. Erosion of the privilege can only complicate and adversely affect the fundamental rehabilitative goals of the juvenile system and any treatment ordered under Act 21.

*Id.*

In reaching this conclusion, the *J.M.G.* Court approvingly discussed this Court's decision in *Commonwealth v. Flynn*, 460 A.2d 816 (Pa. Super. 1983). *See J.M.G.*, 229 A.3d at 576-77, 581. In *Flynn*, a criminal case, this Court held that a psychiatrist's testimony, offered to rebut the defendant's

---

[10] 42 Pa.C.S. § 5944 prohibits the examination of a psychiatrist or licensed psychologist "in any civil or criminal matter as to any information acquired in the course of his professional services" without the written consent of the client.

- 21 -

insanity defense—even if improperly admitted due to the breach of the psychotherapist-patient privilege—was still harmless error. **See Flynn**, 460 A.2d at 823. Thus, our Supreme Court did not intend its holding in **J.M.G.** to apply to criminal proceedings. **J.M.G.** was explicitly premised on the unique purpose of Act 21, in contrast to the variety of interests at stake in criminal cases. Accordingly, **J.M.G.** does not support Appellant's assertion that the harmless error doctrine should not apply to violations of the attorney-client privilege in criminal proceedings such as this one.

Having determined that harmless error may apply, we conclude that it does apply in the specific circumstances of this case. First, Appellant failed to provide anything but a vague assertion of prejudice at trial, and he continues to offer no additional argument as to the prejudice on appeal. Second, the prejudicial nature of the text message was cumulative of both Detective Britton's testimony regarding Appellant's admission, and of Appellant's own testimony at trial that he had killed Hurling. Third, the text message actually corroborated Appellant's claim of self-defense, showing that Appellant has consistently maintained his assertion of self-defense. Under these circumstances, any breach of the attorney-client privilege with respect to the trial court's admission of the first text message was harmless error.

## III.

Finally, Appellant claims that the trial court erred by permitting the Commonwealth to question him using his previous testimony at a status conference hearing where Appellant had lied about an unrelated matter,

arguing that his prior fabrication was prior bad act evidence barred by Pa.R.E. 404(b). During the Commonwealth's cross-examination of Appellant, the following exchange occurred:

> [Assistant District Attorney (ADA) Aurandt]: Good [m]orning, Mr. Lehman. We have been in court together before, but again, my name is Jessica Aurandt from the Commonwealth. Mr. Lehman, you haven't always been honest when you have been in this courtroom for this particular case in front of Judge Kiniry testifying under oath. Is that correct?
>
> [Appellant]: How do you figure?
>
> [ADA Aurandt]: How do I figure?
>
> [Appellant]: Yeah.
>
> [ADA Aurandt]: Let me direct your attention to a status conference on this case where you showed up with a black eye. Do you remember that?
>
> [Appellant]: Yeah.
>
> [ADA Aurandt]: And do you remember the elaborate story that you told the Judge, Judge Kiniry, when he asked you what happened?
>
> [Defense Counsel]: May we approach[?]
>
> (SIDEBAR DISCUSSION)
>
> [Defense Counsel]: I don't think this is the proper way to impeach a witness'[s] credibility from some prior incident. I mean, there's *crimen falsi* and there are other ways, but this isn't one. I'm not even familiar with this. It's probabl[y] before my time, but I don't think this is the proper way to impeach credibility.
>
> [ADA] Aurandt: We are not impeaching. This is [an] admission against interest. We don't have to abide by those same types of guidelines.
>
> The Court: I don't think it's improper. I note your objection.

TCO at 10-11 (quoting N.T., 4/22/21, at 46-47).   Subsequently, the Commonwealth confronted Appellant with his prior testimony at the status conference, where he had initially claimed that his black eye was the result of an injury that occurred when he "went up for a rebound" during a basketball game.  N.T., 4/22/21, at 47.  However, Appellant admitted that he had lied, and that the injury was instead the result of a confrontation.  *Id.*  Appellant refused to call it a "fight," and maintained that he "got jumped."  *Id.*

In Appellant's brief, he argues that this line of questioning was inadmissible under Rule 404(b) because it was ostensibly prohibited by Rule 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character"), and because the Commonwealth failed to give him notice under Rule 404(b)(3) ("In a criminal case the prosecutor must provide reasonable written notice in advance of trial so that the defendant has a fair opportunity to meet it, or during trial if the court excuses pretrial notice on good cause shown, of the specific nature, permitted use, and reasoning for the use of any such evidence the prosecutor intends to introduce at trial").

In its Rule 1925(a) opinion, the trial court indicated that Commonwealth's line of questioning was ultimately permissible as

impeachment pursuant to Pa.R.E. 607, *see* TCO at 12,[11] which provides as

follows:

> **Rule 607. Who May Impeach a Witness, Evidence to Impeach a Witness**
>
> **(a) Who May Impeach a Witness.** Any party, including the party that called the witness, may attack the witness's credibility.
>
> **(b) Evidence to Impeach a Witness.** The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules.

Pa.R.E. 607.

We first address the Commonwealth's assertion that Appellant waived

this claim because Appellant's trial attorney

> argued at sidebar that this was an improper form of impeachment. Impeachment is covered by Pennsylvania Rules of Evidence 607 through 609. No reference to notice under Pennsylvania Rule 404(b) was referenced in the objection nor was there an argument that this testimony amounted to a prior bad act or crime. [Appellant] raised this specific issue for the first time on appeal as it was not preserved as a clear and specific objection before the trial court.

Commonwealth's Brief at 42.

---

[11] In doing so, the trial court rejected the Commonwealth's argument at trial that it was permitted to question Appellant about his false testimony at the status conference hearing because it met the statement against interest exception to the hearsay rules. We agree with the trial court's conclusion in that regard, although for a different reason. Appellant did not assert a hearsay objection to the Commonwealth's line of questioning, and so the Commonwealth's assertion of an exception to the hearsay rules was a *non sequitur*.

We agree with the Commonwealth that Appellant waived this claim on appeal. At trial, Appellant's counsel stated that he did not "think this is the proper way to impeach a witness'[s] credibility from some prior incident." N.T., 4/22/21, at 46. Defense counsel did not cite Rule 404(b), nor did his argument at sidebar reference the ban on prior bad acts evidence at that time. "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

Additionally, in Appellant's Rule 1925(b) statement, he argued that the trial court "improperly allowed the Commonwealth, after objection, to impeach the credibility of [Appellant] on a collateral matter relating to previous statements he had made to the [c]ourt on matters unrelated to his pending charges." Appellant's Rule 1925(b) Statement, 7/20/21, at 1, ¶ 3. The trial court "found that this error presented by Appellant was ambiguous to the point that the [c]ourt was unsure what … Appellant claimed the [c]ourt erred in doing." TCO at 10. Consequently, the trial court "directed Appellant to file a more detailed [Rule 1925(b) statement] concerning this error." *Id.* Appellant responded by filing "a one-sentence [s]upplement" to his Rule 1925(b) statement, in which he merely pointed to the pages in the transcript where the at-issue impeachment occurred. *Id.* The trial court then analyzed Appellant's claim as pertaining to improper impeachment pursuant to Rule 607. *Id.* at 12. The court did not address the matter as a claim that the Commonwealth had improperly used prior bad acts evidence under Rule 404(b).

Given this record, we also conclude that Appellant waived his third claim due to his failure raise it with adequate specificity in his Rule 1925(b) statement (or in the court-ordered supplement thereto). Rule 1925(b)(4) requires that a Rule 1925(b) statement "**shall** concisely identify each error that the appellant intends to assert with **sufficient detail to identify the issue** to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii) (emphasis added). Moreover, "[i]ssues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived." Pa.R.A.P. 1925(b)(4)(vii).[12]

Although Appellant objected to the at-issue impeachment at trial, he never cited Rule 404(b) at that time, nor did he reference the rule's ban on prior bad acts evidence during the sidebar discussion.[13] Consequently, it was not clear from the circumstances surrounding Appellant's objection that it had been premised upon an ostensible violation of Rule 404(b). This was

---

[12] In the trial court's order directing Appellant to file a Rule 1925(b) statement, the court advised Appellant that any "issue not properly included" in the statement "**shall be deemed waived** pursuant to [Rule] 1925(b)(4)." Order, 6/29/21, at 2 ¶ 4 (emphasis in original); *see also Greater Erie Indus. Development Corp. v. Presque Isle Downs, Inc.*, 88 A.3d 222, 225 (Pa. Super. 2014) ("[I]n determining whether an appellant has waived his issues on appeal based on non-compliance with [Rule] 1925, it is the trial court's order that triggers an appellant's obligation[;] ... therefore, we look first to the language of that order.").

[13] We note that a "theory of error different from that presented to the trial jurist is waived on appeal, even if both theories support the same basic allegation of error which gives rise to the claim for relief." *Commonwealth v. Gordon*, 528 A.2d 631, 638 (Pa. Super. 1987).

exacerbated when Appellant failed to reference Rule 404(b) in his Rule 1925(b) statement, explicitly or implicitly. Moreover, Appellant failed to rectify this ambiguity despite the court's affording him the opportunity to supplement his deficient Rule 1925(b) statement. Appellant's failures in this regard resulted in a trial court opinion that is completely unresponsive to the claim Appellant now seeks to raise for the first time in his appellate brief. Accordingly, due to Appellant's failure to preserve this issue with adequate specificity at trial and in his Rule 1925(b) statement, it is waived.

Judgment of Sentence *affirmed*.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  05/11/2022