■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAYMOND BLAIR, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Queens County (Friedmann, J.), rendered April 19, 1990, convicting him of manslaughter in the second degree and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

On May 28, 1988, three men carrying weapons got out of a vehicle and sprayed a house in Queens with bullets, killing Maxcine Peterson, one of the occupants. The three men, along

with the driver of the vehicle, were indicted on murder and weapon possession charges and were tried jointly (see, People v Steadman, 186 AD2d 693 [decided herewith]). The main prosecution witness was Tony Malloy, who testified that he saw the shooting from a nearby house. He identified the defendant, whom he had known for about nine years, as one of the participants. Following a lengthy trial, the jury acquitted all four defendants of intentional and depraved indifference murder and convicted them of manslaughter in the second degree and criminal possession of a weapon in the second degree.

The defendant contends that he was denied a fair trial because the People failed to disclose the full extent of the promises made to Malloy regarding the disposition of his pending criminal cases. The record reveals that, at the outset of the trial, the defense attorneys were informed that Malloy had already been relocated out of State and provided with rent and expenses of $1,500 and that he would be relocated again "at the conclusion of this case and his case". At that time, Malloy had several criminal cases pending, and the trial prosecutor indicated that there were no promises made with respect to the disposition of those cases.

During the trial, Malloy testified that he had three felony cases pending against him and that he realized he could receive up to 25 years in prison. He denied knowledge of any discussions with the District Attorney's office regarding the disposition of his cases before he testified in the Grand Jury about the shooting. On June 9, 1988, a few days after Malloy's Grand Jury testimony, the District Attorney's office purchased airplane tickets to Virginia for Malloy and his girlfriend and paid for his first month's rent on an apartment there. He received a total of $1,500 from the District Attorney's office. Malloy returned to New York in August 1989 and was arrested that same month and charged with selling narcotics. Malloy said he was told in August 1989 by a member of the District Attorney's office that he would be relocated in the future but he was not told when that would happen. Malloy further testified that he and his attorney had conversations with an Assistant District Attorney, but the disposition of his pending cases was not discussed. As of the date of his trial testimony, he said he did not know what would happen with respect to his open cases or when he would be relocated. He said he hoped he would not have to go to jail and had asked to be protected if he did. During Malloy's testimony, his attorney Jonathan Latimer was present and, on his advice, Malloy invoked the Fifth Amendment when questioned about the

facts underlying his pending cases. At one point during a colloquy between the attorneys and the court, the defense attorneys questioned how Malloy could be relocated unless a disposition of his cases was contemplated. Neither of the two trial prosecutors responded, and Latimer indicated that there were no promises as to the disposition of the pending cases.

Although the record is unclear, it appears that, at some point before the People rested, the defense counsel learned that Latimer had been told that, if Malloy testified truthfully, he would not receive prison time on his pending cases. The defendant's attorney subpoenaed Latimer, who sought to quash the subpoena on the ground that his testimony would violate the attorney-client privilege. The court ruled that defense counsel could question Latimer about conversations that occurred when both Malloy and representatives of the District Attorney's office were present but not as to conversations solely between Latimer and Malloy. Defense counsel did not object to this ruling.

Latimer testified that he had conversations with an Assistant District Attorney, who was the trial prosecutors' superior, and that they had reached an understanding sometime after Malloy's Grand Jury testimony in June 1988 that Malloy would not receive prison time on his pending cases and that he would be relocated with preliminary living expenses and assistance in finding employment. Malloy had four open cases, three of which were felonies. Latimer stated that it was his understanding that no promises were to be made to Malloy by anyone. The deal was not discussed with the two trial prosecutors and, to his knowledge, they were not aware of the deal. When the trial prosecutors met with Malloy, they asked him how he would answer a question regarding promises that were made to him, and Malloy said there were none. Latimer refused, on the ground of attorney-client privilege, to testify about the information he relayed to Malloy. When asked if Malloy testified truthfully about any deal, Latimer said "it is my understanding that as a result of those conversations that in fact is his understanding".

Following Latimer's testimony, the defendant moved to dismiss the indictment or for a mistrial on the ground that the promise regarding the disposition of Malloy's pending cases was *Brady* material which should have been disclosed *(see, Brady v Maryland,* 373 US 83). The court reserved decision until after the verdict, and then denied the motion. The court agreed that the existence of the agreement was *Brady* material which should have been disclosed to defense

counsel earlier. The court viewed the actions of Malloy's attorney and the executive level of the District Attorney's office as an improper attempt to shield Malloy from revealing *Brady* evidence and from evidence which could be elicited on cross-examination. However, the court concluded that the defendant was not prejudiced because the agreement was ultimately revealed to the jury, and the manner in which the agreement was revealed was likely to be more prejudicial to Malloy's credibility than prompt disclosure would have been. The court added that it "cannot adequately express in words its disgust that the trial was impacted by a shabbily structured cooperation charade".

We share the trial court's condemnation of the tactics employed here, but conclude that reversal of the defendant's conviction is not warranted. The law is well settled that " 'the existence of an agreement between the prosecution and a witness, made to induce the testimony of the witness, is evidence which must be disclosed under *Brady* principles' ", as such evidence is relevant to the issue of the witness's credibility *(People v Novoa,* 70 NY2d 490, 496; *see also, People v Cwikla,* 46 NY2d 434). Moreover, if a witness lies on the stand regarding consideration received for his testimony, the prosecutor is under a duty to "correct what he knows to be false and elicit the truth" *(People v Savvides,* 1 NY2d 554, 557). It is apparent from this record that the agreement was constructed so as to shield the witness and the trial prosecutors from full knowledge of the extent of the consideration given for Malloy's testimony. The duty to disclose *Brady* material cannot be avoided by insulating the trial prosecutors from the relevant information, as the prosecutor's office is considered one entity for this purpose *(see, Giglio v United States,* 405 US 150). The People contend that, since Malloy's testimony indicated that he was unaware of the promise regarding his pending cases, the agreement had no impact on his credibility, and therefore the *Brady* principles were not violated. We decline to adopt such facile reasoning, as it would allow the prosecutor to be the arbiter of whether such an agreement will impact on the witness's credibility. A witness may be led to understand that his testimony will result in lenient treatment without being told the specific terms of an agreement negotiated by his attorney. We find that it is clear that the spirit, if not the letter, of *Brady* was violated when the District Attorney's office failed to reveal all of the promises made to its witness.

Although the People failed to disclose this information, the

full extent of the agreement with the prosecution was elicited during Latimer's testimony. We therefore conclude that the defendant was not deprived of a fair trial since the information was disclosed in time for him to use the evidence in his case (see, e.g., People v Cortijo, 70 NY2d 868; People v Knowles, 177 AD2d 597). Latimer was subjected to extensive questioning with respect to this issue by defense counsel. We agree with the trial court's assessment that the manner in which the agreement was disclosed was likely to be prejudicial to Malloy's credibility as it provided ample opportunity for defense counsel to argue in summation that Malloy had not been truthful regarding the promises made to him. Indeed, since none of the defendants asked to recall Malloy following Latimer's testimony to question Malloy further about his knowledge of this agreement, it is apparent that the ambiguity created by Latimer's testimony worked to their advantage. Even though disclosure of the information was delayed, the jury was ultimately informed of the terms of the agreement, that Malloy was well aware that he faced 25 years in prison on his pending cases and that Malloy was told he would be relocated at some future time. The consideration that Malloy hoped to receive and the consideration actually promised to his attorney were evident, and the jury could assess Malloy's credibility accordingly. Finally, we note that the court did instruct the jury that Malloy was a cooperating witness and that his self-interest could be taken into account.

The defendant further contends that the court's ruling permitting Latimer to refuse to answer certain questions on the ground of attorney-client privilege, deprived him of his right to confrontation. Latimer invoked the privilege when asked about conversations he had solely with Malloy. We find that this issue is unpreserved for appellate review, as the defendant did not object when the court issued its ruling regarding those areas of questioning which would be barred due to the attorney-client privilege (see, People v Nuccie, 57 NY2d 818). In any event, we find that the court's ruling was proper since Malloy did not waive the privilege, and the conversations at issue involved the disposition of the cases for which Latimer was providing legal services (see generally, People v Osorio, 75 NY2d 80, 84; People v Mitchell, 58 NY2d 368, 373; CPLR 4503 [a]). We also reject the defendant's claim that his right to confrontation was infringed because Malloy was permitted to invoke the Fifth Amendment when questioned about the facts underlying his pending criminal cases. The court's ruling was proper, as Malloy invoked the privilege

on matters collateral to his direct examination *(see, People v Chin,* 67 NY2d 22).

The defendant was charged with two counts of criminal possession of a weapon in the second degree in connection with the shooting on May 28, 1988. One count charged possession of a handgun and the other count charged possession of a machine gun. He contends that the People improperly elicited evidence that he possessed a handgun on another date and that this error was exacerbated by the People's failure to obtain an advance ruling from the court as to the admissibility of this evidence of an uncharged crime *(see, People v Alvino,* 71 NY2d 233; *People v Ventimiglia,* 52 NY2d 350). A police officer testified at the trial that he stopped a vehicle driven by the defendant for a traffic violation two days after the shooting. The codefendant Steadman was in the front passenger seat and another codefendant, Gaines, was in the back seat next to a fourth unidentified individual. The officer observed Gaines holding a loaded ammunition clip from a handgun and later saw him pass a handgun to the fourth individual, who fled from the scene with the gun. As he fled, the passenger tossed an object to the ground, and the police recovered the ammunition clip. A ballistics expert testified that a discharged shell recovered at the scene of the shooting came from this ammunition clip. The admissibility of the ammunition clip was the subject of a *Mapp* hearing, but the officer's observation of a handgun in the vehicle was not mentioned until the trial. The court found that the prosecutors should have sought an advance ruling but determined that the evidence regarding the handgun was admissible. We agree, since the observation of the handgun was interwoven with the subsequent recovery of the ammunition clip and the defendant's arrest *(see, People v Vails,* 43 NY2d 364; *People v Morris,* 168 AD2d 464). In addition, the court instructed the jury as to the limited purpose of such testimony. In any event, we find that any error in this regard was harmless beyond a reasonable doubt *(see, People v Crimmins,* 36 NY2d 230).

We find that the defendant's remaining contentions are either unpreserved for appellate review or without merit. Balletta, J. P., O'Brien, Ritter and Copertino, JJ., concur.