Fordham Dormitory Tower LLC v Tress (2025 NY Slip Op 51378(U))

[*1]

Fordham Dormitory Tower LLC v Tress

2025 NY Slip Op 51378(U)

Decided on September 2, 2025

Supreme Court, Bronx County

Gomez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 2, 2025
Supreme Court, Bronx County

Fordham Dormitory Tower LLC, Fordham Road & Concourse Retail Leasing LLC, 
 and Ivan Diaz, Plaintiff(s),

against
Mendel Tress, Mark Tress, Sun Concourse LLC, AA Sun Concourse LLC, 
 ZM Sun Concourse LLC, 2530 GC LLC, Morris Sabbagh, Kassin Sabbagh Realty LLC, 
 Stanley Conway, and Conway Towne Realty, Defendant(s).

Index No. 32311/20E

Counsel for plaintiffs: Richter Restrepo, PLLC
Counsel for defendants MENDEL TRESS, SUN CONCOURSE LLC, AA SUN CONCOURSE LLC, ZM SUN CONCOURSE LLC, 2530 GC LLC, MORRIS SABBAGH, AND KASSIN SABBAGH REALTY LLC: Wachtel Missry LLP and Andriola Law, PLLC
Counsel for defendant MAEK TRESS: Goldberg Weprin Finkel Goldstein, LLP

Fidel E. Gomez, J.

In this action for, inter alia, fraudulent misrepresentation plaintiffs move seeking an order pursuant to, inter alia, CPLR § 3124, compelling defendants to provide, inter alia, unredacted copies of emails, produced by defendants MENDEL TRESS (Tress Sr.), SUN CONCOURSE LLC (Sun), AA SUN CONCOURSE LLC (AA), ZM SUN CONCOURSE LLC (ZM), 2530 GC LLC (GC), MORRIS SABBAGH (Sabbagh) and KASSIN SABBAGH REALTY LLC (Kassin). Plaintiffs contend, inter alia, that the redactions to the foregoing emails, premised on the attorney-client privilege are unwarranted because, given the record, the foregoing privilege is inapplicable. Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin oppose the instant motion, asserting, inter alia, that the record establishes that the redacted information is, in fact, rendered undiscoverable by virtue of the attorney-client privilege.
For the reasons that follow hereinafter, plaintiffs' motion is granted, in part. 
The instant action is for constructive trust, fraudulent misrepresentation, breach of fiduciary duty, civil conspiracy, unjust enrichment, and piercing the corporate veil. The complaint alleges that in November 2013, plaintiff IVAN DIAZ (Diaz), Chairman of plaintiffs FORDHAM DORMITORY TOWER LLC (FDT) and FORDHAM ROAD & CONCOURSE RETAIL LEASING LLC (FRCRL), after engaging in 18 months of due diligence, acquired the ground unit (Bank Unit) of a two unit commercial condominium located at 2530 Grand Concourse, Bronx, NY 10458 (2530). With the purchase of the ground unit, Diaz was also [*2]assigned a $1 million condominium lien against the other unit at 2530, namely, the Tower Unit. 2530 is an iconic Art Deco and landmark building in the Bronx atop of which sat a giant clock. As a result of years of neglect, 2530 had fallen into disrepair. Upon the acquisition of the Bank Unit, Diaz planned to acquire the Tower Unit and upon renovating 2530, leasing the Bank Unit to a national retailer and housing a boutique hotel in the Tower Unit. Prior to acquiring the Bank Unit, Diaz invested time and money nullifying a deed restriction at 2530 and communicating with the owners of 2530, holders of debt instruments which were secured by 2530, and other private and governmental stakeholders. The foregoing efforts added value to 2530 and created a profitable real estate investment for Diaz and FDT and FRCRL. During the course of his investigation, Diaz ascertained that the Tower Unit was owned by nonparty Family Support Systems (FSS) and was encumbered by a mortgage secured by bonds issued by the New York City Industrial Development Agency. Diaz determined that the foregoing bonds were owned by nonparty Oppenheimer Funds (Oppenheimer) and thereafter negotiated with Oppenheimer to purchase the foregoing bonds so as to obtain ownership of the Tower Unit. Per a contract, Diaz arranged to purchase the foregoing bonds, which were valued at $7.240 million, for only $2.8 million by December 2, 2013. Diaz was unable to purchase the bonds prior to the contract's expiration. However, Diaz and Oppenheimer continued to negotiate and work towards Diaz' purchase of the bonds and Diaz continued to seek a loan to acquire the bonds. Thereafter, defendant STANLEY CONWAY (Conway), a real estate broker, approached Diaz representing that he was interested in helping Diaz find tenants for 2530 in exchange for a brokers's fee. Diaz agreed and provided Conway with confidential information regarding 2530 and the bonds which secured the mortgage encumbering the Tower Unit. In August 2014, Conway began to show 2530 to potential tenants, and on October 20, 2014, indicated to Diaz that he had found a potential tenant, namely Tress Sr., a hotel owner/operator who was interested in leasing the Tower Unit. On October 21, 2014, Diaz met with Tress Sr. and Sabbagh - who represented that he was Tress Sr.'s real estate agent - and they all toured 2530. Upon a request, Diaz provided confidential information about the building to Tress Sr. and Sabbagh. Thereafter, Diaz met defendant MARK TRESS (Tress Jr.), who represented that he was a private hard money lender. On October 2, 2014, Diaz and Tress Jr. executed an agreement, whereby Tress Jr. would lend Diaz $3 million to purchase the bonds securing the mortgage encumbering the Tower Unit. To consummate the agreement, Diaz provided Tress Jr. with confidential information regarding 2530, including documents and agreements regarding 2530 and the contact information for Oppenheimer. Thereafter, despite asserting that there were no impediments to the loan, Tress Jr. ceased all communications with Diaz. On November 26, 2014, FSS deeded the Tower Unit to FDT via a deed-in-lieu of foreclosure. Subsequently, unbeknownst to Diaz and FDT, Tress Sr., Tress Jr., and Sabbagh purchased the bonds from Oppenheimer using Sun to acquire the same. The bonds were purchased for $2.9 million. Conway and Sabbagh brokered the sale of the bonds and were paid for their services. Thereafter, nonparty US Bank National Association as trustees for the bondholders commenced a foreclosure action to foreclose on the mortgage encumbering the Tower Unit and secured by the bonds. On July 21, 2017, at a foreclosure sale, the Tower Unit was sold to AA, ZM, and nonparty AA Sun Concourse Investor LLC, Sun's subsidiaries, and affiliates and/or alter egos of Tress Sr., Tress Jr., and Sabbagh. The Tower Unit was sold for a credit bid of $9.5 million. On October 17, 2017, the Tower Unit was transferred to AA, ZM, and GC., all affiliates and/or alter egos of Tress Sr., Tress Jr., and Sabbagh. On August 31, 2020, Tress Sr., Tress Jr., and Sabbagh executed a contract to sell the Tower Unit for [*3]$17 million. Based on the foregoing, plaintiffs interpose nine causes of action. The first cause of action is for a constructive trust against Tress Sr., Tress Jr., Sabbagh, AA, ZM, and GC, wherein it is alleged that Tress Sr., Tress Jr., and Sabbagh held a position of trust with plaintiffs such that plaintiffs provided them with confidential information regarding the bonds securing the mortgage encumbering the Tower Unit. Plaintiffs detrimentally relied on the promise that the information conveyed to Tress Sr., Tress Jr., and Sabbagh would be used solely to obtain financing and/or tenants for the Tower Unit. However, Tress Sr., Tress Jr., and Sabbagh used the information to intentionally defraud plaintiffs by acquiring the bonds and ultimately title to the Tower Unit. The second cause of action is for fraudulent misrepresentation against Tress Sr., wherein it is alleged that Tress Sr. misrepresented that he was a hotel operator interested in leasing the Tower Unit. Based on the misrepresentation, upon which plaintiffs relied, plaintiffs gave Tress Sr. proprietary and confidential information about the bonds. Tress Sr. used the foregoing information to, along with along with Tress Jr. and Sabbagh, obtain ownership of the bonds and the Tower Unit, thereby depriving plaintiffs the ability to purchase the bonds and obtain the Tower Unit. The third cause of action is for fraudulent misrepresentation against Tress Jr., wherein it is alleged that Tress Jr. misrepresented that he was a lender seeking to lend FDT money to buy the Tower Unit. Based on the misrepresentation, upon which plaintiffs relied, plaintiffs gave Tress Jr. proprietary and confidential information about the bonds. The fourth cause of action is for breach of fiduciary duty against Tress Jr., wherein it is alleged that as lender, Tress Jr. owed plaintiffs a duty of loyalty not to use the confidential information imparted to him by plaintiffs to obtain title to the Tower Unit for himself, Tress, Sr., and Sabbagh. By misleading plaintiffs and purchasing the bonds and obtaining title to the Tower Unit, Tress Jr. breached the foregoing duty. The fifth cause of action is for breach of fiduciary duty against Sabbagh and Kassin, wherein it is alleged that plaintiff entered into an agreement with Sabbagh and Kassin, whereby Sabbagh and Kassin would serve as plaintiffs' real estate broker. As a result, Sabbagh and Kassin owed plaintiffs a duty of loyalty, which they breached by providing assistance to Tress Sr. and Tress Jr. and their fraudulent scheme and by acquiring the bonds and an interest in the Tower Unit. The sixth cause of action is for breach of fiduciary duty against Conway and defendant CONWAY TOWNE INC. (CT), wherein it is alleged that plaintiffs entered into an agreement with Conway and CT, whereby Conway and CT would serve as plaintiffs' real estate broker. As a result, Conway and CT owed plaintiffs a duty of loyalty, which they breached by providing assistance to Tress Sr., Tress Jr., and Sabbagh and their fraudulent scheme to acquire the bonds and an interest in the Tower Unit. The seventh cause of action is for civil conspiracy against all defendants, wherein it is alleged that defendants agreed to act in furtherance of a common scheme to fraudulently induce plaintiffs to turn over proprietary and confidential information regarding the bonds and 2530 to aid Tress Sr., Tress Jr., and Sabbagh in acquiring the bonds and title to the Tower Unit. The eighth cause of action is against all defendants, wherein it is alleged that defendants obtained title to the Tower Unit by fraud thereby causing damage to plaintiffs. The last cause of action is to pierce the corporate veil, wherein it is alleged that Tress Jr. and Tress Sr. own AA, ZM, and GC and exercised complete dominion and control over them in connection with the acquisition of the Tower Unit.
On April 22, 2022, this Court issued a Decision and Order granting Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin's motion seeking dismissal of the first (constructive trust against all defendants), fourth (breach of fiduciary duty against Tress Jr.), eighth (unjust enrichment against all defendants) and ninth (piercing the corporate veil against AA, ZM, and GC) causes of [*4]action in the complaint and vacatur of the Notice of Pendency filed by plaintiffs in this action.
On October 3, 2022, this Court issued a Preliminary Conference Order. 
On January 1, 2024, this Court issued an order after a Rule 14 Conference (22 NYCRR 202.70). Within the order, the Court denied plaintiffs' request to compel Tress Sr., Tress Jr., and Sabbagh to provide unredacted copies of documents produced by them. Tress Sr., Tress Jr., and Sabbagh contended that all redactions made were premised on the attorney-client privilege. Within the order, the Court denied plaintiffs' request, noting that they had failed to establish that the redacted information fell within the ambit of the crime-fraud exception so as to preclude the applicability of the attorney-client privilege. Because depositions had not yet occurred, the Court granted plaintiffs leave to renew the application after depositions were conducted.
On May 10, 2024, the Court issued a Compliance Conference Order. 
On October 28, 2024, the Court issued another order after a Rule 14 Conference (22 NYCRR 202.70), wherein it "granted [plaintiffs] leave to make an application pursuant to CPLR § 3124, limited to the relief sought in their Rule 14 letter." As the Court noted, within their letter, plaintiffs sought to (1) compel production of unredacted copies of the documents exchanged by Tress Sr., Tress Jr., and Sabbagh; (2) compel Sun, AA, and ZM to provide "documents evincing Sun, AA, and ZM's members and said members' respective interest in said defendants;" and (3) compel Sun, AA, and ZM to appear for depositions.
On April 1, 2025, this Court issued an order denying plaintiffs motion for identical relief because they failed to provide working copies of the motion papers as required by this Court's Part Rules. 
 Standard of Review
It is well settled that "[t]he purpose of disclosure procedures is to advance the function of a trial, to ascertain truth and to accelerate the disposition of suits" (Rios v Donovan, 21 AD2d 409, 411 [1st Dept 1964]). Accordingly, our courts possess wide discretion to decide whether information sought is "material and necessary" to the prosecution or defense of an action (Allen v Crowell-Collier Publ. Co., 21 NY2d 403, 406 [1968]). The terms
material and necessary, are, in our view, to be interpreted liberally to require disclosure, upon request, of any facts bearing on the controversy which will assist preparation for trial by sharpening the issues and reducing delay and prolixity. The test is one of usefulness and reason. CPLR 3101 (subd. [a]) should be construed, as the leading text on practice puts it, to permit discovery of testimony which is sufficiently related to the issues in litigation to make the effort to obtain it in preparation for trial reasonable
(id. at 406 [internal quotation marks omitted]). In other words, information that is relevant to an issue in a case is discoverable (Wadolowski v Cohen, 99 AD3d 793, 794 [2d Dept 2012]; Crazytown Furniture, Inc. v Brooklyn Union Gas Co., 150 AD2d 420, 420 [2d Dept 1989]). Whether information is discoverable does not hinge on whether the information sought is admissible and, therefore, information is discoverable merely if it "may lead to the disclosure of admissible proof" (Twenty Four Hour Fuel Oil Corp. v Hunter Ambulance, 226 AD2d 175, 175 [1st Dept 1996]). Indeed, generally, the proponent of discovery need only establish that it seeks discovery in good faith and that the same is material (Johnson v Natl. R.R. Passenger Corp., 83 AD2d 916, 916 [1st Dept 1981] ["The authorizations sought by defendants for medical, employment and school records are for information which is material and necessary to the defense of this action. The words material and necessary are to be interpreted liberally to require disclosure of any facts which will assist the good faith preparation for trial" (internal citations [*5]and quotation marks omitted)]; Flower Cart, Inc. v Fackovec, 163 AD2d 184, 187 [1st Dept 1990] [same]; McElligott v Harper Vending, Inc., 24 AD2d 850, 851 [1st Dept 1965] ["A good faith showing of the materiality of his testimony would require the disclosure of the contents of such statement, but the plaintiffs, though ordered to do so, have refused to disclose the same."]). 

However, "unlimited disclosure is not mandated, and the court may deny, limit, condition, or regulate the use of any disclosure device to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts" (Diaz v City of New York, 117 AD3d 777, 777 [2d Dept 2014]). Thus, the trial court having broad discretion in determining the scope and breadth of discovery, must supervise disclosure and set reasonable terms and conditions therefor (id.). Absent an improvident exercise of discretion, the trial court's determinations should not be disturbed on appeal (id.).
For purposes of discovery, generally the determination of whether the information sought is relevant hinges on the allegations made by the parties in their pleadings (Bayview Loan Servicing, LLC v Charleston, 175 AD3d 1229, 1231 [2d Dept 2019] ["To prevail on its motion, the defendant was required to satisfy the threshold requirement of demonstrating that the disclosure sought is material and necessary to affirmative defense alleging that the plaintiff lacked standing to commence this action" [internal quotation marks omitted].; Anonymous v High School for Envtl. Studies, 32 AD3d 353, 358 [1st Dept 2006] [Court ordered compliance with plaintiff's discovery demands where "[p]laintiff's complaint contains allegations supporting each of plaintiff's document requests."]; U.S. Bank Nat. Ass'n v Ventura, 130 AD3d 919, 920 [2d Dept 2015]; Bravo v Vargas, 113 AD3d 577, 578 [2d Dept 2014] ["A party must provide duly executed and acknowledged written authorizations for the release of pertinent medical records under the liberal discovery provisions of the CPLR when that party has waived the physician-patient privilege by affirmatively putting his or her physical or mental condition in issue. Here, the plaintiff affirmatively placed her entire medical condition in controversy through the broad allegations of physical and mental injuries that were contained in her complaint and bill of particulars, and made during her deposition" [internal citations and quotation marks omitted].).
CPLR § 3124 allows a court to compel disclosure "[i]f a person fails to respond to or comply with any request, notice, interrogatory, demand, question, or order." Thus, when a party responds to discovery demands but provides inadequate responses, the proper remedy is a motion to compel pursuant to CPLR § 3124 as opposed a motion to strike or preclude pursuant to CPLR § 3126 (Double Fortune Property Investors Corp. v Gordon, 55 AD3d 406, 407 [1st Dept 2008] ["Plaintiff having responded to defendant's discovery requests, the proper course for defendant, rather than moving to strike the complaint pursuant to CPLR 3126, was first to move to compel further discovery pursuant to CPLR 3124."]). It is well settled, however, that a party cannot be compelled to produce documents it does not have (Seale v Seale, 149 AD3d 1164, 1165 [3d Dept 2017]; Hawley v Hasgo Power Equipment Sales, Inc., 269 AD2d 804, 804 [4th Dept 2000]), nor can it be compelled to produce a witness over whom it exercises no control (Placede v City of New York, 210 AD2d 18, 19 [1st Dept 1994]).
Provided that more than bare allegations of relevancy are provided, when the proponent of a motion to compel discovery establishes that the discovery sought is material and necessary, the motion should be granted (D'Alessandro v Nassau Health Care Corp., 137 AD3d 1195, 1196 [2d Dept 2016] ["Here, contrary to the defendant driver's contention, the plaintiff's request for the disclosure of her cellular telephone records was not premised on 'bare allegations of [*6]relevancy.'"]; see also (Bayview Loan Servicing, LLC at 1231 [2d Dept 2019]; Clemente v Interboro Ins. Co., 115 AD3d 699, 699 [2d Dept 2014]; Blue Diamond Fuel Oil Corp. v Lev Mgt. Corp., 103 AD3d 675, 676 [2d Dept 2013]; Yoshida v Hsueh-Chih Chin, 111 AD3d 704, 706 [2d Dept 2013]). 
Notably, the proponent of discovery is not entitled to compliance with improperly worded discovery demands (New York Cent. Mut. Fire Ins. Co. v Librizzi, 106 AD3d 921, 921 [2d Dept 2013]; Conte v County of Nassau, 87 AD3d 559, 560 [2d Dept 2011]). As the court in New York Cent. Mut. Fire Ins. Co. stated, the rule is that 
[d]iscovery demands that are overly broad, are lacking in specificity, or seek irrelevant documents are improper . . . [and] [t]he burden of serving a proper demand is upon counsel, and it is not for the courts to correct a palpably bad one
(New York Cent. Mut. Fire Ins. Co. at 922). In fact, where discovery demands are palpably improper in that they are overbroad, lack specificity, or seek irrelevant or confidential information, the appropriate remedy is to vacate the entire demand rather than to prune it (Bell v Cobble Hill Health Center, Inc., 22 AD3d 620, 621 [2d Dept 2005]; Astudillo v St. Francis-Beacon Extended Care Facility, Inc., 12 AD3d 469, 470 [2d Dept 2004]). Similarly, where the demands impose an undue burden, such demands are improper and the party from whom discovery is sought need not comply (Diaz at 777; H.R. Prince, Inc. v Elite Environmental System, Inc., 107 AD3d 850, 850 [2d Dept 2013]). 

The attorney-client privilege prevents the discovery of any confidential communications, made for the purpose of obtaining legal advice, between an attorney and his/her client (Ambac Assur. Corp. v Countrywide Home Loans, Inc., 27 NY3d 616, 623 [2016]; People v Gomberg, 38 NY2d 307, 312 [1975]; New York Times Newspaper Div. of New York Times Co. v Lehrer McGovern Bovis, Inc., 300 AD2d 169, 171 [1st Dept 2002]; see CPLR § 3101[b] ["Upon objection by a person entitled to assert the privilege, privileged matter shall not be obtainable."]; CPLR § 4503[a][1]["Confidential communication privileged. Unless the client waives the privilege, an attorney or his or her employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication, in any action, disciplinary trial or hearing, or administrative action, proceeding or hearing conducted by or on behalf of any state, municipal or local governmental agency or by the legislature or any committee or body thereof. Evidence of any such communication obtained by any such person, and evidence resulting therefrom, shall not be disclosed by any state, municipal or local governmental agency or by the legislature or any committee or body thereof. The relationship of an attorney and client shall exist between a professional service corporation organized under article fifteen of the business corporation law to practice as an attorney and counselor-at-law and the clients to whom it renders legal services."]). The policy undergirding the foregoing is, of course, "to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidences will not later be exposed to public view to his embarrassment or legal detriment" (Ambac Assur. Corp. at 623 [internal quotation marks omitted].; see Priest v Hennessy, 51 NY2d 62, 68 [1980]). Whether the privilege applies is a question of law for the court to determine (People v O'Connor, 85 AD2d 92, 95 [4th Dept 1982]; see Priest v Hennessy, 51 NY2d 62, 69 [1980] ["Applying these principles to the case before us, we conclude that no claim of privilege can be made herein."]), [*7]and is fact specific analysis (Priest at 68 ["no clear rule of general application can be simply articulated. Indeed, as we have often observed much ought to depend on the circumstances of each case" (internal quotation marks omitted].).
It has been observed that the foregoing privilege is at odds with New York's liberal discovery policy and, therefore, it must be narrowly construed (Ambac Assur. Corp. at 623; Spectrum Sys. Intern. Corp. v Chem. Bank, 78 NY2d 371, 377 [1991]). To that end, "[T]he burden of proving each element of the privilege rests upon the party asserting it" (People v Mitchell, 58 NY2d 368, 373 [1983]; Gavin v New York State Bar Ass'n, 39 AD2d 626, 628 [3d Dept 1972]). Accordingly, the proponent of the privilege must establish that the communications sought to be discovered (1) were between counsel and client; (2) were made for the purpose of rendering legal advice or services; (3) were made in the course of a professional relationship; (4) were legal in character; (5) were confidential; and (6) that the privilege was not otherwise waived (Ambac Assur. Corp. at 623; Rossi v Blue Cross and Blue Shield of Greater New York, 73 NY2d 588, 593 [1989]; Spectrum Sys. Intern. Corp. at 377-378; Priest at 68-69). Notably, the privilege applies to any statements made by party to an attorney for purposes of retaining an attorney even if the attorney was never retained (United States v Dennis, 843 F2d 652, 656 [2d Cir 1988] ["To be sure, initial statements made while Pilgrim intended to employ Gerace were privileged even though the employment was not accepted."]).
The attorney-client privilege is waived when privileged communications are made in the presence of a third-party (Ambac Assur. Corp. at 628; John Mezzalingua Assoc., LLC v Travelers Indem. Co., 178 AD3d 1413, 1416 [4th Dept 2019]),or when the client shares privileged communications with third-party (Siras Partners LLC v Activity Kuafu Hudson Yards LLC, 157 AD3d 445, 446 [1st Dept 2018]; Arkin Kaplan Rice LLP v Kaplan, 118 AD3d 492, 493 [1st Dept 2014]). Information relayed to or made in the presence of a third-party will nevertheless remain privileged if the common interest privilege applies (Ambac Assur. Corp. at 628). The common interest privilege protects disclosure
between codefendants, coplaintiffs or persons who reasonably anticipate that they will become colitigants, because such disclosures are deemed necessary to mount a common claim or defense, at a time when parties are most likely to expect discovery requests and their legal interests are sufficiently aligned that the counsel of each is in effect the counsel of all
(id. at 628 [internal quotation marks omitted]). Similarly, when otherwise privileged communications are made to agents of the client and/or the attorney, and "the presence of such third parties is deemed necessary to enable the attorney-client communication and the client has a reasonable expectation of confidentiality," the communications remain privileged (id. at 624). When an attorney represents multiple clients on a matter of common interest to the clients, communications made in the presence of multiple clients is also privileged (id. at 625). 

Despite the foregoing, it is well settled that the attorney-client privilege will not shield communications between a client and his/her attorney "when [the communications] involve[] client communications that may have been in furtherance of a fraudulent scheme, an alleged breach of fiduciary duty or an accusation of some other wrongful conduct" (Art Capital Group LLC v Rose, 54 AD3d 276, 277 [1st Dept 2008] [internal quotation marks omitted]; see In re New York City Asbestos Litig., 109 AD3d 7, 10 [1st Dept 2013]; Ulico Cas. Co. v Wilson, Elser, Moskowitz, Edelman & Dicker, 1 AD3d 223, 224 [1st Dept 2003]). The party seeking to invoke the crime-fraud exception to discover communications to which a privilege has been claimed [*8]must therefore establish a factual basis, akin to probable cause, which demonstrates that a fraud or crime were committed and that the relevant communications were in furtherance thereof (In re New York City Asbestos Litig. at 10-11; Ulico Cas. Co. at 224 ["Testimony regarding conversations between principals of nonparty appellants and a member of the firm as well as the settlement of a related federal action brought by Ulico against PIA and Legion support the IAS court's conclusion that probable cause exists that a fraud was attempted or committed and that the communications were in furtherance thereof, warranting an exception to the attorney-client privilege in favor of disclosure" (internal quotation marks omitted).]. Even where the foregoing proponent of discovery only seeks an in-camera review of the documents sought, there must nevertheless be "a showing of a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies" (In re New York City Asbestos Litig. at 11 [internal quotation marks omitted].).

Discussion
In support of their motion, plaintiffs submit a letter, dated July 8, 2024, sent to counsel for Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin, wherein plaintiff averred that in response to its discovery demand dated November, 3, 2022 [FN1]
, the foregoing defendants failed to provide articles of organization, operating agreements, certificates of incorporation, and other organizational documents for Sun, AA, ZM, and GC. Further, plaintiffs contended that with respect to documents produced by the foregoing defendants, evincing communications between Tress Sr. and nonparty Jerry Feuerstein (Feuerstein) and between Sabbagh and Feuerstein, the redactions made to the same, as well as the refusal to provide other documents memorializing the foregoing conversations, were inappropriate. Essentially, plaintiffs contended that the redactions made and the refusal to turn over certain documents on grounds that the same were privileged pursuant to the attorney-client privilege was inappropriate because Tress Sr., when deposed, testified that Feurerstein was neither Tress Sr. nor Sabbagh's counsel with respect to the events and transactions alleged in the complaint in this action. Appended to the foregoing letter is a privilege log, where each and every single document responsive to plaintiffs' discovery demand was labeled privileged pursuant to the attorney-client privilege.
Plaintiffs submit portions of Tress Sr.'s deposition transcripts, wherein he testified, in pertinent part, as follows. Tress Sr. offered to sell nonparty Eli Lieberman (Lieberman) the contract to purchase the bonds securing the mortgage on the Tower Unit, which Tress Sr. had obtained along with Sabbagh and another partner. With respect to Feuerstein, Tress Sr. testified that Feuerstein represented Lieberman and was performing any due diligence related to the [*9]acquisition of the contract to purchase the bonds from Tress Sr. and Sabbagh. Ultimately, Sun entered into an agreement to purchase the bonds from Oppenheimer, and Feurestein may have reviewed the same. However, Tress Sr. expressly testified that
[m]y counsel was not Jerry Feuerstein on this deal. My counsel on this deal was Roger Raymond. Whether or not — let me finish my — what I'm saying. Whether or not Jerry Feuerstein looked at this deal and might have said, yeah, it's fine to look at, and I might have relied on that maybe. I don't remember. It's way too long ago for me to remember.
Plaintiffs submit portions of Sabbagh's deposition transcript, wherein he testified, in pertinent part, as follows. With respect to Feuerstein, Sabbagh did not remember whether he interacted with him in connection to the purchase of the bonds securing the mortgage on the Tower Unit. With respect to Sabbagh's capacity as broker in connection with the purchase of the bonds, his attorney was Roger Raimond.
Plaintiffs submit a letter dated July 31, 2024, sent to them by Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin wherein they object to plaintiffs' request "for the production of certain communications between the Defendants and" Feuerstein's firm because
[h]aving reviewed the relevant portions of Mendel Tress' testimony and having been present at the deposition of Morris Sabbagh, it is clear that these communications were made by Defendants, as prospective clients, seeking legal advice or representation from KFLLP. Accordingly, these communications are privileged under CPLR 4503. It is of no consequence that Defendants ultimately hired Robinson Brog Leinwand Greene Genovese & Gluck, P.C. instead of KFLLP with respect to the subject transaction and subsequent foreclosure action.
The foregoing defendants further objected to plaintiffs request for organizational documents for Sun, AA, ZM, and GC because "[o]rganizational documents concerning the four defendant limited liability companies in this action are not remotely relevant to these two causes of action."
Based on the foregoing, plaintiffs' application seeking to compel production of all communications between Tress Sr. and Feurestein and Sabbagh and Feurestein is granted. 
As noted above, the attorney-client privilege prevents the discovery of any confidential communications, made for the purpose of obtaining legal advice, between an attorney and his/her client (Ambac Assur. Corp. at 623; Gomberg at 312; New York Times Newspaper Div. of New York Times Co. at 171; see CPLR § 3101[b]; CPLR § 4503[a][1]). However, "the burden of proving each element of the privilege rests upon the party asserting it" (Mitchell at 373 [1983]; Gavin at 628), who must establish that the communications sought to be discovered (1) were between counsel and client; (2) were made for the purpose of rendering legal advice or services; (3) were made in the course of a professional relationship; (4) were legal in character; (5) were confidential; and (6) that the privilege was not otherwise waived (Ambac Assur. Corp. at 623; Rossi at 593; Spectrum Sys. Intern. Corp. at 377-378; Priest at 68-69). Notably, the privilege applies to any statements made by party to an attorney for purposes of retaining an attorney even if the attorney was never retained (Dennis at 656).
Here, contrary to the assertion by Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin, the evidence presented by plaintiffs, namely, the excerpts from Tress Sr. and Sabbagh's deposition testimony establishes that the attorney-client privilege does not apply to any communications they had with Feuerstein. To be sure, Tress Sr. testified that with respect to the purchase of the bonds securing the mortgage concerning the Tower Unit Feuerstein represented Lieberman and [*10]was performing any due diligence related to the acquisition of the contract to purchase the bonds from Tress Sr. and Sabbagh. He further testified that Feuerstein may have "looked at this deal and might have said, yeah, it's fine to look at, and I might have relied on that maybe. I don't remember. It's way too long ago for me to remember." Sabbagh testified that he did not remember whether he interacted with Feuerstein in connection to the purchase of the bonds securing the mortgage on the Tower Unit but that with respect to Sabbagh's capacity as broker in connection with the purchase of the bonds, his attorney was Roger Raimond.
Contrary to the assertion by Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin, the foregoing testimony establishes, that the communications between Feurestein and Tress Sr. and Feurestein and Sabbagh and Feurestein were not subject to the attorney-client privilege because the testimony fails to establish any of the requisite elements of the privilege, namely that the communications between Feuerstein and Tress Sr. and Feuerstein and Sabbach were made for the purpose of rendering legal advice or services; were made in the course of a professional relationship; were legal in character; and were confidential (Ambac Assur. Corp. at 623; Rossi at 593; Spectrum Sys. Intern. Corp. at 377-378; Priest at 68-69). 
Indeed, here, Tress Sr. and Sabbagh's testimony was essentially that they could not remember the nature of the relationship between them and Feuerstein and Sabbagh testified that his attorney was not Feuerstein, but rather Roger Raimond.
In addition to the foregoing, there is no merit to the claim that the documents sought are subject to the attorney-client privilege because, as urged, Tress Sr. and Sabbagh consulted with Feuerstein but ultimately hired Robinson Brog Leinwand Greene Genovese & Gluck, P.C. While it is true that the attorney-client privilege applies to any statements made by party to an attorney for purposes of retaining an attorney even if the attorney was never retained (Dennis at 656), here, Tress Sr. and Sabbagh's testimony, which is essentially the inability to recall the nature and the extent of any relationship they had with Feuerstein fails to establish the applicability of the privilege under this portion of the jurisprudence.
To the extent that in opposition to plaintiffs's motion, Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin submit a portion of Sabbagh's deposition transcript wherein he testified that he "may" have consulted with other attorneys in connection with the purchase of the bonds, including Feuerstein, this does not avail the foregoing defendants. Again, this vague testimony about a possible attorney-client relationship falls woefully short of the burden required to shield communications from production under the attorney-client privilege. The same is true with respect to an email submitted by Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin dated October 22, 2014, wherein Sabbagh apprises Conway that he was trying to reach Feurestein, his attorney, to handle the foreclosure alleged in this action. Such statement, when considered in light of the record, fails to establish the requisite elements for necessary to invoke the attorney-client privilege so as to shield the documents sought by plaintiffs from production. At best, it establishes that Sabbagh called Feurestein, which by itself does not create an attorney-client relationship. 
Plaintiffs' motion seeking to compel production of, inter alia, organizational documents for Sun, AA, ZM, and GC is granted, in part, to the extent of ordering that AA, ZM, and GC to provide the documents sought and appear for depositions. With respect to Sun, the record evinces that it appeared for a deposition and that it provided plaintiffs with its operating agreement. Indeed, here, plaintiffs append the very agreement they seek to their motion papers. Thus, the relief sought against Sun must be denied as moot.
With respect to AA, ZM, and GC, as noted above, "[t]he purpose of disclosure procedures is to advance the function of a trial, to ascertain truth and to accelerate the disposition of suits" (Rios v Donovan, 21 AD2d 409, 411 [1st Dept 1964]). Accordingly, our courts possess wide discretion to decide whether information sought is "material and necessary" to the prosecution or defense of an action (Allen v Crowell-Collier Publ. Co., 21 NY2d 403, 406 [1968]). The terms, material and necessary must be construed liberally (id. at 406), and information that is relevant to an issue in a case is discoverable (Wadolowski at 794; Crazytown Furniture, Inc. at 42). Indeed, whether information is discoverable does not hinge on whether the information sought is admissible and therefore, information is discoverable merely if it "may lead to the disclosure of admissible proof" (Twenty Four Hour Fuel Oil Corp. at 175).
For purposes of discovery, generally the determination of whether the information sought is relevant hinges on the allegations made by the parties in their pleadings (Bayview Loan Servicing, LLC at 1231; Anonymous at 358; U.S. Bank Nat. Ass'n at 920; Bravo at 578). Generally, the proponent of discovery need only establish that it seeks discovery in good faith and that the same is material (Johnson at 916; Flower Cart, Inc. at 187; McElligott at 851).
CPLR § 3124 allows a court to compel disclosure "[i]f a person fails to respond to or comply with any request, notice, interrogatory, demand, question, or order." Thus, when a party responds to discovery demands but provides inadequate responses, the proper remedy is a motion to compel pursuant to CPLR § 3124 as opposed a motion to strike or preclude pursuant to CPLR § 3126 (Double Fortune Property Investors Corp. at 407).
Here, the remaining causes of action the complaint, including one for fraud and civil conspiracy, allege that all defendants, including AA, ZM, and GC, agreed to act in furtherance of a common scheme to fraudulently induce plaintiffs to turn over proprietary and confidential information regarding the bonds and 2530 to aid Tress Sr., Tress Jr., and Sabbagh in acquiring the bonds and title to the Tower Unit. It is alleged that the fraud alleged occurred in 2014 (second and third causes of action) when Tress Jr., Tress Sr., and Sabbagh misrepresented the reasons they were interacting with plaintiffs and thereafter, using confidential information, purchased the bonds for the Tower Unit from Oppenheimer. Thereafter, in 2017, it is alleged that AA, ZM, and GC acquired the Tower Unit at a foreclosure sale and that the foregoing defendants were affiliated with Tress Sr., Tress Jr., and Sabbagh. 
Based on the foregoing, given the foregoing allegations, the documents sought by plaintiffs from AA, ZM, and GC, including the organizational documents, are material and necessary to the claims made by plaintiffs since they would likely reveal what involvement, if any, Tress Sr., Tress Jr., and Sabbagh have with AA, ZM, and GC. 
Contrary to the assertion by Tress Sr., Sabbagh, AA, ZM, and GC, the temporal attenuation between the fraud alleged in 2014 and 2017, when AA, ZM, and GC were formed, does not render the discovery sought irrelevant. Indeed, it is alleged that the purchase of the Tower Unit by AA, ZM, and GC was part and parcel of the fraud alleged against Tress Sr., Tress, Jr., and Sabbagh. Nor does it avail Tress Sr., Sabbagh, AA, ZM, and GC, that Tress Jr. testified at his deposition that he has never held an interest in Sun, AA, ZM, or GC and that he has never been compensated by the same. 
Again, generally, the proponent of discovery need only establish that it seeks discovery in good faith and that the same is material. As such, once that burden is satisfied, to preclude disclosure, as urged, because the opponent proffers facts tending to negate the allegations in the complaint would be anathema to this State's liberal discovery process. In other words, for [*11]purposes of disclosure, a party cannot be deprived of discovery by an opponent's self-serving statements. To be sure, the entirety of the discovery paradigm promulgated by both case law and statute require liberal discovery designed to obtain information to establish, test, or rebut the allegations made by all parties to an action. If a party could thwart disclosure by merely proffering self-serving facts tending to render the information sought irrelevant it would turn the discovery process on its literal head. 
Lastly, to the extent that Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin contend that the discovery sought from AA, ZM, GC is nonparty discovery, for which no leave of court has been sought, such assertion is without merit. Here, AA, ZM, and GC are parties to the instant action since the seventh (civil conspiracy) cause of action against them has not been dismissed. While the same, as noted by this Court in its Decision and Order, dated April 22, 2022, is not an independent cause of action, it is nonetheless one where liability attaches if, inter alia, there is liability under a primary tort (cohen Bros. Realty Corp. v Mapes, 181 AD3d 401, 404 [1st Dept 2020] Abacus Fed. Sav. Bank v Lim, 75 AD3d 472, 474 [1st Dept 2010]). Thus, here, where there remain claims for fraud, AA, ZM, and GC are, in fact, parties, against whom a claim for civil conspiracy is alleged.
Plaintiffs' application seeking discovery sanctions pursuant to CPLR § 3126 is denied. Significantly, here, per this Court's Rule 14 Conference Order, dated October 28, 2024, plaintiffs were only granted leave to make an application pursuant to CPLR § 3214, to compel discovery. It is hereby
ORDERED that within 30 days of service of this Decision and Order upon them, Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin provide plaintiffs (1) unredacted copies of all communications between Feuerstein and Tress Sr. and Feuerstein and Sabbagh concerning the purchase of the bonds and the subsequent sale of the Tower Unit; (2) Articles of Organization, Operating Agreements, Certificates of Incorporation, or other organizational documents for AA, ZM, and GC, including, but not limited to, any documents reflecting the membership of each of the foregoing entities. It is further
ORDERED that AA, ZM, and GC appear for depositions within 60 days of service of this Decision and Order upon them. It is further
ORDERED that the Note of Issue be filed by December 31, 2025. It is further
ORDERED that all parties appear for a Settlement Conference on January 7, 2026 at 10am. It is further
ORDERED that plaintiffs serve a copy of this Decision and Order with Notice of Entry upon Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin within 30 days hereof.
This constitutes this Court's Decision and Order.
Dated: September 2, 2025
Bronx, New York
HON. FIDEL E. GOMEZ, JSC

Footnotes

Footnote 1:Although plaintiffs fail to provide a copy of the discovery demand referenced in their letter, Tress Sr., Sun, AA, ZM, GC, Sabbagh, and Kassin provide a copy, which evinces that the same seeks "Articles of Organization, Operating Agreements, Certificates of Incorporation, or other organizational documents of Sun LLC, AA LLC, ZM LLC, and 2530 LLC including, but not limited to, any documents reflecting the membership of each of the foregoing entities." Further, the demand also seeks documents which evince conversations between Tress Sr., Sun, AA, ZM, GC, Sabbagh, Kassin, and anyone related to the transactions alleged in the complaint, namely, the purchase of the bonds concerning the Tower Unit, and the contact that the foregoing defendants had with plaintiffs.