J-A23015-25

2026 PA Super 34

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PARIS ELIAS CARTER | : | No. 65 WDA 2025 |

Appeal from the Orders Entered January 10, 2025 and January 13, 2025
In the Court of Common Pleas of Butler County
Criminal Division at No(s): CP-10-CR-0000935-2021

BEFORE: PANELLA, P.J.E., McLAUGHLIN, J., and BENDER, P.J.E.

OPINION BY PANELLA, P.J.E.: **FILED: February 24, 2026**

The Commonwealth appeals[1] from the trial court's pretrial orders prohibiting the Commonwealth from introducing certain recordings of phone calls made by Paris Elias Carter while incarcerated, based on the court's finding that the calls are more prejudicial than probative. We reverse in part and affirm in part.

---

[1] The Commonwealth filed one notice of appeal from the orders entered January 10 and 13, 2025, certifying these orders substantially handicap the prosecution. Accordingly, this appeal is properly before this Court. *See* Pa.R.A.P. 311(d); *see also Commonwealth v. Moyer*, 954 A.2d 659, 661 n.1, (Pa. Super. 2008) (en banc). We note our research has revealed no pertinent criminal law requiring separate notices of appeal for challenges to multiple orders at one docket number. Accordingly, the caption for this opinion reflects the dates of both trial court orders. *See Commonwealth v. Angel Miguel Velazquez*, 849 EDA 2022 (Pa. Super. filed March 31, 2023) (unpublished memorandum); *see also* Pa.R.A.P. 126(b) (allowing this Court to rely on unpublished memorandum issued after May 1, 2019, for their persuasive value).

This case initially was scheduled for trial in April 2023. However, the Commonwealth filed a permissible interlocutory appeal on April 11, 2023 from the trial court's decision on a prior motion *in limine*. A panel of this Court summarized the factual history of this matter in that prior appeal as follows:

> On May 17, 2021, around noon, four individuals—Tashane Henry[2], David Hines, Dante [Carter[3]], and Carter,—shared drinks at a bar in New Castle, Pennsylvania. [Tashane] testified that, on that date, he was aware that Hines owned two firearms, and, while at the bar, [Tashane] observed that Hines possessed one firearm while Carter possessed the other. [Tashane] saw the firearms in both Hines' and Carter's waistbands at the bar. After leaving a second bar—where the group continued to eat and drink—the four men returned to Hines' girlfriend's house, where everybody was "smokin'" and "chillin'."
>
> At some point, Hines told the group that he wanted to drive to Pittsburgh that day and wanted the others to join him on the ride. There was a "little dispute" between Hines and Carter on the porch, but [Tashane] testified that it "wasn't deep at all," and everyone was "chillin'," "rappin'," "shaking hands, [and] smokin' [a marijuana blunt] together." On cross-examination, [Tashane] testified that both Carter and Hines, during their brief argument, each told the other, "[I'm] like you[, too]." [Tashane] further detailed—though perhaps not very clearly—the brief encounter, which, he said, lasted less than one minute, as follows:
>
> And I [(Tashane)] was like: ["]What you all talking about?["] He's like[,] "it was like nice." Kept saying that, ["]I'm like you and you's like me.["] And I'm like[, "]What you all talking about?["] Like, ["T]his my man, this my cousin, and that's that. It ain't nothing." They shook hands and went back to smokin' and chillin' and talkin'.

---

[2] We have changed all further references to Tashane Henry to "Tashane", to be consistent with the references to him during the phone calls at issue.

[3] Paris Carter and Dante Carter are brothers. For clarity, Paris Carter is referred to as Carter, and his brother as Dante.

At some point that afternoon, [Tashane] agreed to join Hines on the proposed trip to Pittsburgh. After an hour or so at Hines' girlfriend's house, at approximately 3:00 p.m., the four men left in Hines' girlfriend's silver Jeep and headed for Pittsburgh. At some point during their trip, the group "smoked a blunt," and after leaving a gas station, [Tashane] was driving, Hines was in the front passenger seat, Dante was seated behind Hines, and Carter behind [Tashane]. [Tashane] testified that Hines and Carter continued to possess firearms at this point. Further, [Tashane] explained that while driving on the highway after leaving the gas station, seemingly unprompted and without warning, Carter fired three shots at Hines' head, missing with the first shot but hitting Hines twice thereafter, killing Hines instantly. [Tashane] testified that he was blinded by the gunpowder from the shots fired.

[Tashane] further testified that, immediately after the shooting, Carter stated, "I heard you was about this, [ ] you bitch," which [Tashane] took to mean that Carter was stating that Carter was "a gangster."

[Tashane] explained that he was unaware of any conflict between Carter and Hines at that point. [Tashane] further described that, within seconds of the shooting, he was shaking and pulled over the car, and asked why Carter had shot his friend, Hines. Carter then demanded to drive and took over driving the group for a short period, speeding down the highway, before exiting it. [Tashane] testified that Carter drove for approximately fifteen minutes before pulling over "on a weak part of the rocks," that gave way under the weight of the car, causing the Jeep to tilt and become stuck at that location.

[Tashane] explained that, once the silver Jeep became stuck, Carter, with a hand in his pants, urged the men to run away through the woods. [Tashane], Dante, and Carter, left the vehicle on foot, leaving Hines deceased in the passenger seat of the Jeep. The men eventually arrived at a campground.

Angelina Lopez, [Tashane]'s girlfriend at the time, testified at the preliminary hearing that she picked up the three men from that campground in her gold minivan. Lopez testified that no one wanted to talk during the drive back from the campground and the men told her that [Tashane] and Carter had gotten into an argument. Once back at [Tashane]'s residence, [Tashane]

testified that he showered, and he and Carter then abandoned their clothes in a nearby dumpster.

About thirty minutes after arriving at [Tashane]'s residence, Lopez testified that there was a conversation in the backyard wherein Carter admitted to the shooting, as follows:

[ ] [Carter] came outside. [Carter] started shaking his head. And I said[, "]What happened, what really happened, why were you arguing[?"] And he said[, "]Man,["] and he just kept shaking his head. And he said[, "]I had to get him out of here, I had to down him.["] And I said[, "D]own who[?] What are you talking about[?"] I kept asking what he was talking about. I said, ["W]hat, did you drop somebody?["] ... And he said[, "N]o.["]

And he said, ["M]an, man," and he kept going like this. And I said[, "]What happened, what happened[?"] And he said[ ] [Tashane] told him to come outside and to talk to me about what happened. And then [Tashane] comes outside, and he said[, "]Tell her, tell her, tell her what really happened. Tell her that you killed my man.["] And I ran[, and said, "W]ho the 'f' did you kill?["] And he said[, "]Tell her that you killed Chop, tell her you killed Chop.["] And I took my food in the house and I put the chicken that I was going to put on the grill and I put it in the refrigerator.

When asked to elaborate on the statements relating to "down[ing] his man," Lopez testified as follows:

He said ... he had to ["]down him.["] And I said[, "D]own who? Who are you talking about?["] That's what I said[, "]What did you do?["] And then he said[, "]Man,["] and then I said[, "]What did you do?["] And he said[, "]I had to down him. I had to get him, get him going, get him outta here,["] or something like that. And I said[, "Did you fuckin' kill somebody?["] And he said[, "]Man,["]—and [Tashane] said[, "]Tell her, tell her you killed my man, you killed my man."

Lopez further testified that, during that conversation, although he never expressly admitted to the shooting, Carter stated, "He had to go. He had to go." After that conversation, Dante was crying on the floor and told Carter, "Man[,] you're so young, you got so

- 4 -

much potential." Thereafter, at [Tashane]'s residence, Carter informed [Tashane] that he wished to be brought to Philadelphia so he could then proceed to Atlanta.

The following day, at approximately 9 a.m., [Tashane], Lopez, their four children, Carter, and Dante, drove to Philadelphia in Lopez's gold van. At some point during the drive, police pulled the van over, and [Tashane] and Lopez both testified that, as the officer approached the stopped van, Carter let a gun fall under the baby seat and retrieved it immediately after the officer left. [Tashane] and Lopez dropped off Carter and Dante in Philadelphia and eventually reported the murder to police.

From Philadelphia, the Commonwealth alleges that Carter and Dante made their way to Fulton County, Georgia. On May 20, 2021, police had [Tashane] place a recorded call to Dante, in which he discussed why Carter shot Hines. The Commonwealth alleges that forty minutes later, Carter shot Dante in a ride-share vehicle, which shooting was recorded by surveillance cameras in the car. The Commonwealth also alleges that, during the investigation of that shooting, the ride-share driver told police that, while driving Carter and Dante, he heard a person on the other end of the phone with Dante tell Dante to hand Carter the phone, and the ride-share driver remembers Dante complying with that request.

The Commonwealth charged Carter with criminal homicide on August 24, 2021, in connection with Hines' murder. On December 30, 2021, the Commonwealth filed notice of its intent to admit evidence of the Georgia shooting against Carter in the Hines murder case, pursuant to Pa.R.E. 404(b). Specifically, the Commonwealth sought to introduce evidence that: (1) following Hines' shooting, Carter and Dante fled to Atlanta; (2) while in Atlanta, Carter shot Dante in the back of the head; and (3) Dante survived the Georgia shooting.

On February 15, 2023, Carter filed a motion *in limine*, seeking to prevent the Commonwealth from introducing the evidence it identified in its Rule 404(b) notice. On April 3, 2023, the court issued an order finding it premature to rule on the motion *in limine*. The following day, the Commonwealth sought reconsideration and/or clarification of the court's decision. After a hearing, on April 10, 2023, the court granted Carter's motion *in*

*limine*, prohibiting the Commonwealth "from introducing in its case-in-chief the evidence proffered in its [Rule 404(b)] Notice[.]"

On April 11, 2023, the Commonwealth filed an interlocutory appeal from the trial court's April 10, 2023 order, pursuant to Pa.R.A.P. 311(d).

***Commonwealth v. Carter***, 320 A.3d 140, 143-46 (Pa. Super. 2024) (citations and footnotes omitted). On appeal, we affirmed the April 10, 2023 order in part, reversed the order in part, and remanded to the trial court. Specifically, we affirmed the portion of the trial court's order excluding evidence showing that Carter non-fatally shot his brother, Dante, in the back of the head in a ride-share vehicle in Atlanta and reversed the portion excluding evidence of Carter's flight to Atlanta.

Upon remand, following a status conference in October 2024, the trial court scheduled a pretrial conference on November 8, 2024, call of the list on January 7, 2025, jury selection on January 8–9, 2025, and trial the week of January 13, 2025. An additional pretrial conference was held on January 3, 2025.

The trial court selected the jury on January 8, 2025. That same day, Carter filed a motion *in limine* asking that 9 recordings of phone calls placed by Carter from the Butler County Prison be rendered inadmissible as unfairly prejudicial pursuant to Pa.R.E. 403(b). Specifically, Carter argued the calls did not contain any admissions of culpability and the content of several of the calls included references to ongoing plea negotiations, other pending criminal cases, and inadmissible hearsay, which would violate his constitutional

confrontation rights since some of the individuals in the conversations were not being called as witnesses at trial.

Following a hearing on January 9, 2025, the court entered an order granting Carter's motion *in limine* in part, prohibiting the Commonwealth from introducing recordings of phone calls made by Carter while incarcerated from the Commonwealth's case-in-chief, except phone calls identified as call # 3, 26 and 110. **See** Order, 1/10/25. The court found the precluded calls to be "more prejudicial than probative pursuant to Rule 403." **Id.** Finally, the court stated it would defer a decision if the Commonwealth wished to present a rebuttal. **See id.**

On January 13, 2025, the date scheduled for trial, the court heard from the parties regarding the Commonwealth's request to admit another phone call, placed on January 6, 2023, to Carter's cousin Safadeem. Following the hearing, the court ruled the call was inadmissible, again finding the call was more prejudicial than probative pursuant to Rule 403. The court subsequently entered an order to that effect. This timely appeal followed.

On appeal, the Commonwealth argues the trial court erred by granting Carter's motions *in limine*, thereby excluding evidence of Carter's consciousness of guilt, admission of guilt, and efforts to intimidate a witness. **See** Appellant's Brief, at 3. The Commonwealth provided a chart detailing the calls it planned to introduce parts of, which relevantly detailed the calls currently at issue as follows:

| Date of Call | Name of Call / Receiver of Call | Brief Description of the part of the call intended to be introduced in trial |
|---|---|---|
| June 23, 2021 | No. 41 / Appellee's father | Appellee told his dad he might use the self-defense claim. Appellee also stated, I wish it wouldn't have went like that, I promise you that. |
| November 15, 2021 | No. 111 / Appellee's father | Appellee stated, I wish I could go back. |
| [October 4, 2022] | 05_192 / Appellee's mother and brother Dante | Appellee, while speaking with his brother, said on multiple occasions that so long as people close their mouth Appellee would be home. He also told his brother that if he showed up at trial Appellee didn't know what would happen. |
| February 28, 2023 | 03_191 / A cousin of Appellee | Appellee states that if Tashane and Angie Lopez show up, they're going to cook him. |
| March 2, 2023 | 02_074 / Unknown male | Appellee is rapping on the phone with lyrics that include[] the statement, my man died and I was haunted for weeks, I got close range and I put a bullet right in your beak. Also, niggas ratting, one shot and I knock his brains on him, you better watch your six. |
| March 19, 2023 | 06_213 / Unknown male | Appellee is rapping on the phone with lyrics talking about presumably Tashane testifying against him and how he wanted to strap a bomb to the witness stand. |
| January 6, 2023 | 01_208 / A cousin of Appellee | Appellee is talking to his cousin about how if the roles were reversed, and he was out on the street, he would be on the Commonwealth's strongest witness, Tashane Henry's, top right now. Appellee repeatedly tells his cousin that he should be |

| | | on Tashane's top right now. Appellee states that Tashane went out of his way to get his little cousin the "elbow." The cousin on the phone tells Appellee that he was afraid Appellee was going to shoot him or Tashane and Appellee quickly tells his cousin that he cannot get into this conversation over the phone. |
|---|---|---|

Appellant's Brief, at 9-14.[4]

Initially, we acknowledge Carter argues "[t]he Commonwealth's failure to present its issues with accuracy or meaningful legal development renders them waived." Appellee's Brief, at 13. However, as we find that any deficiencies in the Commonwealth's brief do not hinder our ability to conduct meaningful appellate review, we decline to find waiver. **See Commonwealth v. Midgley**, 289 A.3d 1111, 1118 (Pa. Super. 2023) ("[W]e will not find waiver if the appellant's failure to provide citation to legal authority or develop an issue does not impede our ability to conduct meaningful appellate review.") (internal quotation marks, brackets, and citation omitted).

Our standard of review is well-settled. We utilize an evidentiary abuse of discretion standard when reviewing the denial of a motion *in limine*. **See Commonwealth v. Mitchell**, 902 A.2d 430, 455 (Pa. 2006). Misapplication

---

[4] We note there is no official transcript of the above phone calls. However, we have carefully listened to the challenged phone calls and have noted certain relevant lines in our analysis below. We have quoted or paraphrased the calls to the best of our ability.

of the law by the trial court is an abuse of discretion. *See Commonwealth v. Dillon*, 863 A.2d 597, 600 (Pa. Super. 2004). "[O]ur scope of review is limited to an examination of the trial court's stated reason for its decision to preclude the admission of the evidence in the Commonwealth's case-in-chief." *Id*. (citation omitted).

Generally, the threshold question with the admission of evidence is whether the evidence is relevant. *See Commonwealth v. DiStefano*, 236 A.3d 93, 98 (Pa. Super. 2020). Pursuant to our Rules of Evidence, evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and that fact is of consequence in determining the action. *See id*.; Pa.R.E. 401. Even if evidence is relevant, however, the court can still exclude the evidence if it concludes that the probative value of the evidence is outweighed by, among other things, a danger of unfair prejudice, confusing the issues or needlessly presenting cumulative evidence. *See* Pa.R.E. 403.

However, "[e]vidence is not unfairly prejudicial simply because it is harmful to the defendant's case." *Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa. Super. 2009) (citation omitted). Our Supreme Court has stated a trial court is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." *Commonwealth v. Lark*, 543

A.2d 491, 501 (Pa. 1988); *see also Page*, 965 A.2d at 1220. Exclusion of evidence on the grounds it is prejudicial is "limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Commonwealth v. Foley*, 38 A.3d 882, 891 (Pa. Super. 2012).

First, the Commonwealth argues the court erred in excluding call 01_208, because a defendant's attempts to interfere with witness testimony is admissible to show consciousness of guilt. *See* Appellant's Brief, at 19 (citing *Commonwealth v. Johnson*, 838 A.2d 663, 680 (Pa. 2003)). Again, in call 01_208, Carter is talking to his cousin about Tashane.

In support of its ruling excluding call 01_208, the trial court reasoned the call was inadmissible because, given the entire context of the conversation, the court concluded Carter was merely complaining about his situation and not attempting to intimidate a witness or have a third person intimidate a witness. *See* Trial Court Opinion, 3/21/25, at 6. Since the court did not find Carter threatened or instructed his cousin to intimidate a witness on this call, and because the call is replete with Carter yelling slang words, the court concluded the call is more prejudicial than probative of any relevant evidence. *See id.*

After careful review of the call, we agree with the trial court. Carter was clearly upset throughout the phone call that Safadeem gave money to Tashane. The main takeaway is that Carter was telling Safadeem he should

not be aiding Tashane since he is testifying against Carter. What we interpret from this call is that Carter was telling Safadeem that he needed to pick a side, between Carter or Tashane; that he could not support both of them. We cannot conclude this call was an attempt to interfere with a witness's testimony. Accordingly, we do not find the trial court erred in precluding admission of call 01_208.

Next, the Commonwealth argues the trial court abused its discretion in excluding calls 41, 111, 05_192, and 03_191, because Carter's statements during those calls show his consciousness of guilt and/or his admission of guilt.

In calls No. 41 and 111, Carter was talking to his father, and expressed in both calls that he wished things had gone differently and/or that he could change what happened. **See** Commonwealth Exhibit 1, file 10.36.101.27-3a69824d0a24651b6671743c333925e9—Call 41, at 7:31 to 7:33; **see also** Commonwealth Exhibit 1, file 10.36.144.21-262c230a0a24901554d0985811c70b14—Call 111, at 14:10-14:15. Although Carter does not expressly state whether he is talking about either the Hines murder or the shooting of his brother in Atlanta, the Commonwealth argues these statements clearly relate to Carter's situation with Hines, and show he wished he would have resolved the argument in another way. **See** Appellant's Brief, at 23-24. Further, to the extent it is unclear, the Commonwealth contends there is no risk of confusion as this Court has already prohibited the

Commonwealth from presenting evidence regarding Carter shooting Dante while in Atlanta. **See id.** at 25; **see also Carter**, 320 A.3d at 150-51.

The trial court disagreed, concluding these statements must be viewed in the context of the entire conversations, as well as Carter's overall situation—including not just the instant charges for homicide in Butler County, but also his charges in Atlanta, GA for allegedly shooting his brother, Dante. **See** Trial Court Opinion, 3/21/25, at 4. After careful review of these phone calls, we are similarly unsure to which matter Carter is referring, and we must therefore defer to the trial court's determination. Therefore, we cannot even say these calls are relevant to the instant matter. Since Carter was speaking with his father, it is entirely possible he was expressing remorse for what happened with his brother in Atlanta, without any regard for the instant charges. Without more, we cannot find these calls are relevant to this case. Accordingly, we affirm the court's preclusion of these two calls.

In call 05_192, Carter is speaking with his brother, Dante. After Dante asks Carter when he is coming home, Carter expresses that "as long as [witnesses] close their mouth I'll be home." Commonwealth Exhibit 1, file 20221004-132453-05_192, at 4:38-4:43. Carter then says "as long as [Tashane] don't show up then I'm going home bro … He already showed up at the prelim[ary hearing] … If he show up to trial I don't know what's going to happen." **Id.** at 6:05-6:36. Similarly, in call 03_191, while talking to another cousin of his, Carter says that if they—referring to witnesses, including

Tashane—show up at trial, "they are going to try to cook me." Commonwealth Exhibit 1, file 20230228-110624-03_191, at 12:20-12:32.

The Commonwealth argues both of these calls show Carter's consciousness of guilt. *See* Appellant's Brief, at 24. Notably, it is unclear from the Commonwealth's brief, in what way the Commonwealth believes these particular calls show consciousness of guilt.

After careful review, as with call 01_208, we cannot conclude these calls show an attempt to interfere with a witness's testimony. There is no direction for any of the callers to do anything regarding the witnesses. Instead, the calls primarily involve Carter expressing his frustration about his circumstances, i.e. his ongoing incarceration, and the possibility of a life sentence. We also cannot conclude these calls showed any admission of guilt. The gist of the conversations is that Carter appears uncertain about his prospects at trial, particularly because of witness testimony that had already been given at the preliminary hearing, and the sentence he could possibly receive. However, he never makes any actual admissions. Again, without more, these calls are not probative of any meaningful information. Accordingly, we affirm the court's preclusion of these calls.

Finally, the Commonwealth notes that the trial court now agrees that it erred in granting the motion *in limine* as to the phone calls involving Carter's rap lyrics, call 02_074 and 06_213. Specifically, the trial court finds the lyrics would be relevant to show Carter's involvement in the crimes charged because

the lyrics describe a crime similar to the alleged murder in this case. **See** Trial Court Opinion, 3/21/25, at 6 (citing further review of **Commonwealth v. Talbert**, 129 A.3d 536 (Pa. Super. 2015)).

Pennsylvania courts have found rap lyrics to be admissible in cases "where the content of those lyrics sufficiently dovetailed with real-world events and persons, so as to dispel the risk that the lyrics were purely fictional." **Commonwealth v. Lehman**, 275 A.3d 513, 521 (Pa. Super. 2022). For example, in **Talbert**, this Court determined the defendant's own lyrics were admissible to corroborate his role as one of the shooters "because they had referenced specific details involved in the murder for which Talbert was charged, including mentions of the neighborhood of the shooting, the weapons used, the escape vehicle, and the nature of the wounds to the shooting victims." **Id.** at 522 (citing **Talbert**, 129 A.3d at 540-41).

Similarly, in **Commonwealth v. Flamer**, 53 A.3d 82 (Pa. Super. 2012), Derrick White shot and killed a Commonwealth witness, Abdul Taylor, and the Commonwealth sought to admit evidence that Marvin Flamer and Nafeast Flamer conspired with White to murder Taylor. We concluded the rap lyrics found in Nafeast's prison cell were related to the conspiracy to kill Taylor because "Nafeast talk[ed] about people 'keeping their mouths shut', sending his friends to kill for him, and 'popping shells' in people that 'run their mouth.'" **Flamer**, 53 A.3d at 89. Accordingly, we held the trial court abused its discretion in excluding Nafeast's writings and raps. **See id.**

Here, we agree with the trial court's redetermination of this issue regarding calls 02_074 and 06_213, in which Carter communicated with callers and provided information in the form of rap lyrics. In call 02_074, before he started rapping, Carter stated he wanted to record his own "jawns," indicating that he wrote the lyrics himself. **See** Commonwealth Exhibit 1, file 20230302-115655-02_074, at 3:40-3:42, 4:08-4:15. The rap lyrics, sung by Carter, fit right in with the factual allegations of the crimes charged—that the victim was shot at close range in the back of the head while traveling in a car. **See id.** at 4:15-4:30. Similarly, on call 06_213, Carter said he "made this jawn" and wanted it recorded. Commonwealth Exhibit 1, file 20230319-123658-06_213, at 5:08-5:10. The rap lyrics from this call, also sung by Carter, reference Tashane testifying against him, and how he wished a bomb was strapped to the witness stand. As these calls describe a crime similar to the alleged murder in this case, we find the lyrics are relevant for admission to show Carter's involvement in the charged crime.

Based on the above findings, we reverse the January 10, 2025 order in part. Specifically, we reverse the part of the order prohibiting the Commonwealth from introducing calls 02_074 and 06_213. We affirm the order in all other respects. Further, we affirm the January 13, 2025 order, precluding the introduction of call 01_208.

January 10, 2025 order affirmed in part and reversed in part. January 13, 2025 order affirmed. Jurisdiction relinquished.

- 16 -

President Judge Emeritus Bender joins the opinion.

Judge McLaughlin files a concurring and dissenting opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

2/24/2026